THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FIERO GARIPPO, Plaintiff in Error.

*Opinion filed April 23, 1926.*

1. CRIMINAL LAW—*what evidence of conversation with defendant's wife is not admissible.* Where the defense to a charge of murder is that the defendant shot the deceased in a fit of passion or emotional insanity because the deceased had attacked his daughter and niece while they were attending a public school where the deceased was employed, a conversation which the defendant's wife had with teachers of the school, out of the presence of the defendant, tending to show that one of the boys in the school, and not the deceased, had made the attack is hearsay and is not admissible.

2. SAME—*when witness should not be cross-examined as to his previous arrest.* Although a witness testifies on direct examination that he had never been in court before, it is not proper impeachment of the witness to cross-examine him as to his previous arrest for certain crimes, as a witness can be impeached only by the record, or a certified copy thereof, of his conviction of an infamous crime; and to arrest the witness and detain him after his direct examination for the sole purpose of ascertaining whether or not he had testified falsely is an absolute disregard of the witness' constitutional rights.

3. SAME—*what necessary to be shown to impeach a witness on account of prior conviction.* To impeach a witness on the ground of his prior conviction of an infamous crime the record of such conviction, or a certified copy thereof, must be introduced, and it must show conviction of such crime, only, as the statute declares to be infamous.

4. SAME—*when an instruction as to self-defense is improper.* An instruction as to self-defense which leaves the jury to determine from their own viewpoint whether the defendant was in imminent danger of losing his life or of receiving great bodily harm is improper, as the test is whether it appeared to the defendant, acting as a reasonable man at the time, that he was in such danger.

5. SAME—*instructions embodying sections 148 and 149 of the Criminal Code should not be given in murder trial.* Instructions embodying sections 148 and 149 of the Criminal Code should not be given in a murder trial, as they are seldom, if ever, applicable to the facts in the particular case.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES A. WILLIAMS, Judge, presiding.

JAMES J. BARBOUR, and OTIS F. GLENN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Fiero Garippo, (hereinafter referred to as defendant,) was indicted in the criminal court of Cook county for the murder of Jeremiah McShea on May 9, 1923. He pleaded not guilty, and upon a trial the jury returned a verdict finding him guilty of manslaughter and sentencing him to the penitentiary "at the discretion of the court." The jury had not been given a form of verdict for manslaughter and the court sent them back into the jury room to bring in a proper verdict. Over the objections of attorneys for the defendant the court then gave the jury a form of verdict for manslaughter, and they found the defendant guilty of manslaughter and his age to be thirty-one years. Motions for a new trial and in arrest of judgment were overruled and judgment and sentence was entered on the verdict. He has sued out this writ of error for a review of the record.

The facts as presented by the State are, that the deceased, an engineer at one of the public schools of Chicago, left his work about 5:30 in the afternoon of May 9, 1923, at the Jacob Riis school, on Lytle street, in Chicago, and was accosted by the defendant a short distance therefrom, on Lytle street. The defendant pointed a gun at the deceased and fired two shots, both of which struck the deceased and mortally wounded him. The defendant left the scene of the shooting and surrendered himself to the police. The deceased was taken to the county hospital, where he died on the following day. The defendant's wife, and a witness named Fusco, were the only eye-witnesses to the

shooting. A Mrs. Feingold, who resided near the scene of the shooting, heard the shots fired and testified to what took place immediately after the shooting, stating that she was lying on her bed in her rear bed-room and heard a shot fired directly across the street. While going to her front window from her bed-room she heard another shot fired. When she arrived at the window she saw the defendant and the deceased standing opposite each other, and the deceased had his hands on his stomach and was saying "Ow!" She saw the deceased fall and the defendant disappear, running into the alley or passageway there. On being arrested the defendant stated to the police that the deceased had been "fooling around with his little girl and little niece and had been doing bad things to them and he had shot him." The police stated that the defendant said that he had gone to the school to meet the deceased and to ask him what he had done to the children; that when he met the deceased he asked him what he had done to his little girl, and the deceased pulled back from him, and he thought he was going to pull a gun from his pocket and he then shot him, and that he forgot what he was doing and did not know what he was doing from then on but walked into the alley and threw his gun away.

The defendant testified in his own behalf in substance as follows: His little girl, of the age of seven years, had complained of being sick and was in bed a week or more before the shooting. He directed his wife to take her to a doctor, and his wife took the child to Drs. Furno and Meyerovitz. His wife returned with the child from Dr. Furno and stated to him that the child had been attacked by a big person and "somebody must fool around with her." The court excluded from her statement, over the objections of the defendant, the quoted words, "somebody must fool around with her," because it was a mere conclusion of hers and not a statement of facts. The wife further told him the child was sick and sore between her legs.

His wife treated her private parts with boric acid. He saw his little girl and saw a spot of blood between her legs. On the day of the shooting he sent his daughter to school, and at about eleven o'clock that morning he sent his wife to the school to see who the man that had fooled around with his daughter was and what was the matter. His wife stayed at the school longer than he thought it would take her to go there and back and he went to see the principal. He asked the principal to show him the man that had mistreated his daughter, and the principal told him that she would show him the man but did not like to call him into the room as she did not want him to know anything about it. The principal then took him to the engine room and pointed out the deceased to him. The principal then told him that she would take care of the matter herself and let him know that day. He said all right and took his little girl to the engine room and she pointed out the deceased as the man that had made her sick. He and his wife then left the school and returned to his store. His little girl told him that her cousin, Flora, a little girl of the age of about nine years, was in the same condition that she was in and that it had been caused by the same man. His wife then told him that the cousin Flora had said the same thing that her daughter had said and that the engineer of the school had done the same thing to her. His daughter then gave him the details of the indecent assault made upon her by the deceased. His wife went back to the school in the afternoon. He was excited and cried all day. In the afternoon, about 5:30, he again went to the school to find out from the principal what she had done. There was no one at the school and he left it and went to purchase some candy for his store. He returned by way of the school and met the deceased on South Lytle street and asked him if he was the engineer of the school. On being informed that he was, he asked him, "What did you do to my little girl in the basement, you know?" The deceased then pulled back his fists,

called him a dirty name and struck him in the face, knocking him backwards over a curb-stone, between the sidewalk and the street, and he fell down in the street on his left arm and side. The deceased then unbuttoned his coat and put his hand toward his pocket, and the defendant's wife cried out, "Look out, Frenchy! He has got a gun!" This occurred while he was getting up out of the street where he had fallen after being struck by the deceased. He was on his knees and drew his gun and shot the deceased. Then his wife again cried out, "Look out, now! He has got a gun!" and then he again shot the deceased. The deceased then ran into a passageway, and he (the defendant) ran south on Lytle street and through the alley and threw his gun away. He returned to his store later that evening and surrendered to the police. He positively stated that he believed that he was in danger when he shot the deceased, and he thought that the deceased was reaching for his gun when he put his hand toward his pocket. He also stated that he was crazy at that time and had been crying all day and acting crazy. He at the time of the shooting had his left arm in a case because it had been fractured some time previous. He had formerly been a night watchman for Hart, Schaffner & Marx, and as such night watchman he had a permit from the chief of police to carry a gun.

Dr. Meyerovitz testified that he examined defendant's daughter and niece on the day of the shooting, and on his examination of the defendant's daughter found a contusion of the vulva, with some discoloration, swelling, and a bloody streak running along one side of the thigh. He stated that the hymen was not ruptured, but that the vagina was bruised on the outside and the labia was bruised on the inside, and that there was considerable swelling and discoloration of both little girls. He asked the defendant's girl what was the matter with her, and she said that the engineer of the school had put a stick in her, and pointed to her vagina, and when asked by the doctor what she meant by "stick,"

she said, "big thing." Dr. Furno also testified to having examined defendant's daughter and found an abrasion and a slight serum, colored with blood, and signs showing irritation. He stated that the abrasions might have come from a number of other conditions than the male organ.

Mike Fusco testified: He was at the school on the day of the shooting, looking for a nephew. He saw the defendant and the deceased talking; heard the deceased say to the defendant, "Get to hell out of here, you son of a bitch!" He was about fifty feet away from the parties, and just as the deceased made the above statement to the defendant he swung his right arm and hit the defendant in the face. The defendant fell over the curb and into the street, and just as he fell the witness saw the deceased put his hand in his pocket and the woman said, "Look out, Frenchy! He is going to shoot you!" and while the defendant was still down he drew his gun and fired the first shot at the deceased. The woman again cried out to the defendant that the deceased was going to shoot him, and that while the deceased had his hand in his pocket the defendant again fired. The witness described the parties, what they wore, and stated that the defendant did not have his left arm in his coat sleeve. This witness, on cross-examination, stated that he did not tell the police about the shooting or testify at the inquest, and also stated that he had not been in a court room before.

Immediately after the above testimony of Fusco he was arrested and remained in the custody of the State's attorney and the police and in jail all that evening and night and on the next day was re-cross-examined by the State. On being asked by the State's attorney if he was ever before in a court room, he answered "yes." He was then asked if he was ever arrested and what he was arrested for, and over the objections of the defendant testified that he had been arrested for being in an automobile accident, and again for stealing an automobile and $2700 worth of cigars. On

re-examination by the defendant's counsel he stated that the assistant State's attorney who was trying the case talked to him three or four times concerning the various offenses for which he had been arrested previously; that he cursed him and told him that he had lied in his testimony in everything on the day before and in every way, in reply to which he told him that he had told the truth. He further stated that he was detained by the assistant State's attorney and the police and kept in jail all night since his arrest and without any food whatever. While the witness was thus testifying on re-examination, the assistant State's attorney, in the presence of the jury, made this statement: "We had him here because he lied on the witness stand. The jury will decide."

On rebuttal the State introduced the testimony of the principal of the school, Cecelia B. Schimek, and of another teacher, Helen Fitzgerald, the former testifying as follows: She had a conversation with the defendant's wife at the school building with reference to her daughter and her niece and Frank Daniello, a small boy in the same room with the two girls. His wife said to the witness that her daughter had been attacked by the Daniello boy, and the witness told the wife of the defendant that she would get the mother of the Daniello boy and they would talk it over together. On the morning of the following day the witness sent for the wife of the defendant and met with her and the mother of the Daniello boy in her office. The defendant's wife then said to the witness that it was not the Daniello boy and that her daughter had said that it was the engineer of the school, and that he had done the same thing to her niece, who was also a pupil at the school. The witness then went to the room where Florence Giraud, defendant's niece, attended and brought her to the assembly hall, and there, in the presence of the defendant's wife, asked her what had happened. Defendant's wife then talked to the little girl in Italian, and witness told her to let the little

girl tell what she wanted to, and to not put thoughts into her head. The witness then asked the little girl to show them where the attack had taken place, and she showed them a place in the school yard, and the teacher told the defendant's wife that no man would be such a fool as that and told her that it could not have happened there. Helen Fitzgerald testified: She was a teacher at the Jacob Riis school and defendant's daughter and the Daniello boy were pupils in her room. On the day before the shooting the defendant's wife told her that the Daniello boy "did dirty things to my little girl," and the witness asked her if the Daniello boy had attacked her daughter, and she replied that he had. Defendant's wife then asked her daughter if that was the boy, pointing to the Daniello boy, and the daughter replied that it was.

These conversations took place out of the presence and hearing of the defendant. It is significant that the principal of the school did not deny the testimony of the defendant as to the conversation that he stated he had with her, and her promise to the defendant that she would see that the janitor was properly looked after, or words to that effect, and she corroborated him as to the fact that on his request she went with him and the little girl to the engine room and that the little girl then pointed out the engineer as the one that attacked her. There was no theory upon which the evidence of these two witnesses as to the said conversation out of the presence and hearing of the defendant was admissible. It was hearsay testimony pure and simple.

Dr. Krohn, an expert on mental diseases, basing his testimony upon the evidence that had been given by the witnesses, gave it as his opinion that the defendant was not insane at the time he shot the deceased. He stated as his reasons that a man who was so overcome by his feelings as to feel like he was crazy and did not know what he was doing would not appreciate that he was in danger or that

his life was in danger; that such a man would not be able to transact business; that a man so overwrought with emotion and stress as claimed by the defendant would not know where he had thrown the gun and would not recall that he was knocked down and had heard a voice telling him that he was in danger, and that a man who is emotionally insane would be absolutely oblivious to everything else and would not appreciate any danger that he was in.

There were nine witnesses who were admittedly good citizens,—a lawyer, a doctor, a druggist, a merchant, a real estate dealer and a manufacturer and others,—who testified that the general reputation of the defendant in that neighborhood as a peaceable and law-abiding citizen was good, and none of them had ever heard aught against him.

The defense of the defendant was self-defense and emotional insanity. As we understand the brief and argument of the defendant, the evidence of the frenzied condition of the defendant at the time of the difficulty in question was not introduced for the purpose of showing that the defendant was so insane that he was not accountable for any criminal conduct whatever, but was introduced for the purpose of showing that the defendant was in such a frenzied state of mind and so wrought up by what he supposed to be the conduct of the deceased with his daughter and niece that he was incapable of having and entertaining the malice aforethought that is necessary to constitute the crime of murder and could not be convicted of a higher offense than manslaughter. If that was the theory of the defendant he was not prejudiced by the giving of the instructions bearing upon the question of emotional insanity, as he was not found guilty of murder, although it clearly appears that such instructions, or some of them, are erroneous by reason of the fact that they appear to place the burden of proving such insanity upon the defendant, while the law is that he should have the benefit of the defense if upon the whole evidence there was a reasonable doubt of the defendant's

guilt of the crime of murder. On the next trial the question before the jury will be as to whether or not the killing of the deceased by the defendant was such as to constitute the crime of manslaughter or was done under circumstances that entitled him to a verdict of not guilty on the ground of self-defense.

The contention of the defendant that the conversations of the two teachers with his wife, out of his presence and hearing, were inadmissible and very prejudicial to the defendant must be sustained for the reasons already stated. There is no theory upon which this evidence was admissible, and it was particularly prejudicial because of the fact that the defendant's wife was an incompetent witness either for or against the defendant, and she could not be permitted to testify even to the extent of contradicting the statement of the two teachers.

The cross-examination of the witness Fusco by the State, in which he was compelled, over the objections of the defendant, to testify that he had been arrested and charged with certain crimes, was very erroneous and prejudicial. We have frequently ruled that only the record of the conviction of a witness of an infamous crime, or a certified copy thereof, may be introduced in evidence for the purpose of discrediting such witness, citing *Bartholomew* v. *People,* 104 Ill. 601, and other similar holdings. The record of the conviction of another felony not named by our statute as an infamous crime cannot be introduced for such purpose.

The court gave to the jury forty instructions, thirty-five of which were offered by the prosecution and five by the defendant. The defendant offered forty-one instructions, a number of which stated the law correctly with reference to the defense of self-defense and should have been given for the defendant,—at least some of them. The law of self-defense was not correctly stated in those given for the State, as the test laid down in those instructions for determining whether or not the defendant was in imminent

danger of losing his life or of receiving great bodily harm was to be determined from the viewpoint of the jury on the consideration of the evidence, and not by the defendant acting as a reasonable man at the time of the shooting. About all of the instructions of the State, if not all, ignored the defendant's defense of self-defense. Some of the instructions for the State were literal copies of sections 148 and 149 of our Criminal Code, which we have repeatedly held are inapplicable in criminal cases generally. These errors in the giving of instructions are all fully discussed in the cases of *People* v. *Durand,* 307 Ill. 611, and in *People* v. *Jones,* 313 id. 335, and no further discussion of them in this case is necessary.

During the course of the trial the assistant State's attorney made many improper and frivolous objections without any apparent reason whatever. He frequently attacked the attorneys for the defendant and his conduct was very insolent. In his argument to the jury he used improper language in his reference to the defendant's counsel. A typical instance of his unethical conduct in this regard is in this language in his argument to the jury: "Men, can you figure this? Senator Barbour and Senator Glenn, two men, your representatives and mine in Springfield to make the laws, after they lifted their hands to heaven and swearing to enforce all laws, in this court room trying to cheat the law; trying to break the law by pleading two defenses—insanity and self-defense." The attorneys for the defendant objected to this remark but the jury were not instructed to disregard it.

There are many other errors assigned and argued, but it is not necessary to consider them here as they may not arise again on the next trial.

For the reasons aforesaid the judgment of the criminal court is reversed and the cause is remanded.

*Reversed and remanded.*