(No. 19947.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LAFON FISHER *et al.* Plaintiffs in Error.

*Opinion filed June 20, 1930.*

JOSEPH B. LOFTON, WILLIAM M. JAMES, JOHN L. FO-
GLE, and RICHARD E. WESTBROOKS, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A.
SWANSON, State's Attorney, and ROY D. JOHNSON, (ED-
WARD E. WILSON, JOHN HOLMAN, C. WAYLAND BROOKS,
and CHARLES A. BELLOWS, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiffs in error, Lafon Fisher, Leonard Shadlow and
Leon Brown, with one Melvin Jenkins, Herbert Hare and
Steve Dixon, were indicted for the murder of Martin
French. Dixon was not apprehended, Hare was given a
separate trial, and Fisher, Shadlow, Brown and Jenkins
were tried at the April, 1929, term of the criminal court
of Cook county, were found guilty, and Fisher, Shadlow
and Brown were sentenced to death and Jenkins to life im-
prisonment. The three first named bring the cause here,
assigning numerous errors on the record.

On January 18, 1929, five men entered the Franklin
Trust and Savings Bank at the corner of Thirty-fifth street
and Michigan avenue, in the city of Chicago, at about one
o'clock, in an attempt to rob the bank. The five men were
armed with pistols and a sawed-off shot-gun, and while
four of them kept their guns trained on the officers, em-
ployees and patrons of the bank who were in the bank at
the time, one of them climbed over the top of the teller's
cage, and, drawing a gun, required the teller to hold a cloth
sack while he took the money from the desk. However,
shooting commenced just before the robber inside the cage
reached the money, and seizing a handful of bills, amount-
ing, as was afterwards found, to $801, he dashed out of
the bank building. It appears that Martin French, a for-
mer police officer, who was then police officer for the bank,

was in the bank when the robbers came in. It appears that he drew his gun and the firing commenced. A number of the officers and employees of the bank joined in the fusillade and about twenty shots were fired. This all occurred within three or four minutes, by which time the robbers had left the bank. French was found lying on the floor of the bank lobby suffering from gunshot wounds. He was taken to the hospital and that afternoon died. Evidence showed that his death was caused by two loads from a shot-gun in the hands of one of the robbers. There was also found in his body the wadding from a shot-gun load and a .38-calibre bullet in the upper right thigh, which traveled inward and slightly upward but which was not a dangerous wound. Edgar Olson, one of the officials in the bank, was shot in the wrist and Leo Poquette was wounded in the left ankle. That evening, about 8:30, the police arrested plaintiffs in error and some fifteen or sixteen other persons at No. 3341 Wabash avenue. They were taken to the Stanton avenue police station and kept there during the night. On the morning of January 19 one John E. Geraghty, a patron of the bank, went to the police station and there identified plaintiff in error Shadlow as one of the men participating in the robbery and as the one who used the shot-gun. Other persons visited the police station that morning to determine whether any of the persons held were among the robbers. Shadlow was the only person positively identified at that time.

On the afternoon of the 19th plaintiffs in error and others were taken to the detective bureau. Shadlow was taken before deputy commissioner of police John Stege, who informed him that he had been identified as one of the men participating in the robbery and requested that he tell him about it. Stege testified that after a moment or two hesitation Shadlow admitted to Stege and lieutenant of police Eugene Barry, who with his squad had made the arrest, that he, Shadlow, together with Fisher, Brown, Jenk-

ins and Dixon, participated in the hold-up. Stege thereupon
called the State's attorney's office and assistant State's at-
torney Bellows arrived at the dectective bureau about an
hour later. Shadlow was again brought to the commission-
er's office, and in the presence of Charles Bellows, the as-
sistant State's attorney, Stege, officers Armstrong and Sul-
livan, and three citizens, Harry W. Solomon, Robert Mc-
Ewen and John V. French, made a detailed confession,
which he signed. Brown and Jenkins were brought before
the same group and made statements. These statements
were first made individually and not in the presence of the
other parties charged. Questions were asked by Bellows
and answers made by the prisoner being questioned and
reported by Frank A. Sheeder, a court reporter. The ques-
tioning of these defendants began about 6:15 in the evening
and continued until nearly 1:00 o'clock in the morning of
January 20. Brown and Fisher first made a statement be-
fore lieutenant of police William J. Cusack, which was taken
on the typewriter by officer Sullivan. When Fisher was
questioned he was first alone before Cusack, Sullivan and
other officers. After the statement had progressed a short
while Brown was brought into the room and the questions
and answers which had been asked of and given by Fisher
were read to Brown, who confirmed all of them with one
exception, which had to do with the length of time Brown
had known Fisher. When correction was made of this, with
the assent of Fisher, the questions were then propounded in
the presence of both Fisher and Brown and their answers
transcribed. Each read and signed the statement. Later in
the evening Brown made a more detailed confession before
assistant State's attorney Bellows, Stege, Barry and others.
Fisher made no further statement. The preliminary state-
ment signed by Brown and Fisher consisted of two full
pages of questions and answers. The statement of Shad-
low consisted of five and one-half typewritten pages, of
Jenkins four pages, and Brown's second statement five

pages. Except for minor discrepancies, each confession or statement details the same acts and happenings before, at the time of and after the robbery; each gives the individual's birthplace, age, occupation, residence, marital status and length of acquaintance with each other; each stated that he had not been abused, mistreated or promised immunity and that he understood any statement he made might be used against him. Their confessions described in some detail preliminary conferences held by them at which plans were made for the robbery and each assigned his particular task. Their stories agreed almost in minutiæ and are substantially as follows:

After a conference in the morning of January 18, 1929, at 3341 Wabash avenue, while eating a lunch, Shadlow, Fisher, Brown, Jenkins and Dixon, a few minutes before one o'clock, took their gun or guns and left 3341 Wabash avenue. Jenkins drove the automobile and Dixon rode with him. Fisher, Brown and Shadlow walked. All arrived at the bank at about the same time. The car was parked on the east side of Michigan avenue, a few feet north of the bank entrance. Jenkins guarded the outside door with a .45 Colt automatic. Dixon, Shadlow, Brown and Fisher entered the bank through the main entrance on Michigan avenue. One of them said, "Stick 'em up!" Dixon turned to the right and to the south part of the room. Fisher went directly east and climbed over the teller's cage, carrying a .32 Savage automatic pistol. Brown followed Fisher and stood in front of the teller's cage with a .38-calibre revolver in each hand. Shadlow stood on the inside of the banking room, a little north and east of the door, with a .32-calibre revolver. As Fisher dropped over behind the cage the shooting began. He went into the cage, seized a handful of bills, vaulted back over the cage and all the robbers ran out of the bank.

Jenkins in his confession stated that as soon as the first shot was fired he ran down Michigan avenue and through

an alley. About 4:30 in the afternoon he went to Dixon's home, and there Dixon showed him a wound he had received in the head. He remained there until about 8:00 o'clock in the evening and arrived at 3341 Wabash avenue about 8:30, where he was immediately arrested and taken to the police station. Before making his written confession on Saturday afternoon Jenkins told officer Barry that after the robbery he hid his .45 automatic in a rubbish can at 3308 Indiana avenue. Officer Barry and a Mr. McKay went to the spot and found the gun, fully loaded, no shots having been fired therefrom. Jenkins took the stand in his own defense and admitted having participated in the robbery and testified to substantially the same facts recited in his confession.

Shadlow's first confession was not entirely consistent with the others. In it he claimed that Dixon had the shotgun and that he drove the car—a Stearns-Knight sedan. Later, when brought back before Bellows, he made an amended statement, stating that Jenkins drove the car. He therein stated that he mingled with the crowd after the hold-up and did not leave until the police squad had arrived at the bank and left, and that he later returned to 3341 Wabash avenue, where he was arrested.

Fisher's statement was, that after the hold-up he jumped in the car with Brown and Dixon; that Dixon drove the car north on Michigan avenue to Thirty-fourth street, west on Thirty-fourth street and then north to Twenty-sixth street, then east to a place one block west of Wentworth avenue, where Dixon left the car. Brown then took the wheel and drove to Thirty-seventh and Federal streets, where the car was abandoned and that they returned to 3341 Wabash avenue, where they found Shadlow and argued with him about the division of the money until the police arrived and arrested them.

Officer Barry testified that immediately after the robbery he scoured the district with his squad and found an

abandoned Stearns-Knight sedan near Thirty-seventh and LaSalle streets, and in the car was a sawed-off loaded shotgun and two exploded shells of the same gauge as the gun.

Brown's confession says that he fired five shots; that a white fellow fired two times at him and he returned the fire, and that after the robbery he jumped to the car with Dixon and Fisher. His statement varies slightly as to the route of the car going to the point where Dixon left it, but admits that he eventually returned to 3341 Wabash avenue and with Fisher and Shadlow was arrested at that place about 8:30 that same evening.

On Sunday, the 20th, about one o'clock in the afternoon, plaintiffs in error, together with Jenkins, were taken to the bank. At the time they arrived at the bank several officers and employees of the bank, various police officers, including commissioner Stege and officer Barry, and a large number of citizens, including a witness Dr. McEwen, were congregated in the bank. There was a large group of people on the outside. Plaintiffs in error and Jenkins were asked by commissioner Stege to select the respective guns used by them and that they take their places as they had done on the previous Friday at the time of the robbery. The guns were held by officer Barry. Fisher, Brown, Shadlow and Jenkins each made his selection of the gun used by him and took his position. Fisher took the .32 automatic, Jenkins the .45 automatic, Shadlow the .32, and Brown the two .38 revolvers. A police officer took the shotgun and stood at the place where Brown said Dixon stood. Several witnesses testified that no one told the prisoners what positions to take. Officer Barry testified that while returning from the bank to the police station each defendant put his initials on the gun used by him. In taking their positions in the bank Fisher climbed on top of the teller's cage and posed while a photograph was taken. When each took his place occupied by him at the time of the robbery, Brown remarked, or motioned, to Shadlow to move, as he

was not in the correct spot, and Shadlow moved to the place indicated by Brown.

Plaintiff in error Fisher was identified by William C. Jahn, teller of the bank, as the one who had climbed over the top of and into the teller's cage. Robert A. McEwen, a dentist with offices in the same building, directly over the bank, testified that from a window he saw Fisher run from the bank and jump into the automobile; that at the time of the re-enactment he talked with Fisher and told him he might have shot him from his window, but the latter said: "It was lucky, doctor, that you did not have your gun. You would have been out of luck. I would have plugged you." Jahn also testified that he talked with Fisher at the time of the re-enactment of the crime in the bank on Sunday and stated to him that he was glad that he, Fisher, did not have itchy fingers on the day of the robbery, and Fisher replied: "Oh, I wouldn't have shot you. I could have gotten you some other way."

Officer Barry testified that after Fisher's arrest the latter told him that the guns could be found in the ashes in the pit under the furnace at 3341 Wabash avenue, and that the witness and other officers went to the place and found the guns as directed.

Several witnesses positively identified Shadlow. Dr. Phillip Kreuscher testified that he took a .38-calibre bullet, appearing in this record as exhibit 22, from the body of French at the hospital. He identified exhibit 22 as the same bullet taken from French's body. The witness Calvin Goddard testified that he was a consultant on small arms and projectiles; that he devoted all his time to that sort of work. He testified, giving his reasons for his conclusion, that exhibit 22 was fired from a gun which the evidence shows was in the hands of one of plaintiffs in error.

Jenkins took the stand and testified to the part which he took in the robbery. On objection of counsel for plaintiffs in error he was not permitted to state who was with

him. His testimony was a confession of his participation in the crime and agrees with his written confession made before the police.

Plaintiff in error Brown took the stand and testified that he had nothing to do with the crime and that he was not present but was on the West side of the city with a friend named Cecil Hoffman. He also testified that he was beaten, kicked and otherwise mistreated, and that the confession signed by him was made against his will and was not true but was made to avoid further punishment. He testified that he had lived in Chicago since about 1918 and was in that city during the first four months of 1920. He stated that he was a confidence game man, and that when not engaged in legitimate employment practiced the confidence game and made his living thereby. As impeachment the State offered an exemplified copy of the record of the criminal court of Jackson county, Missouri, which showed that one Loraine Brown was sentenced to the penitentiary in that State on March 19, 1920, for a period of ten years on his plea of guilty to a charge of robbery with a gun. One J. E. Gorman also testified in behalf of the People that he was on March 19, 1920, chief clerk of the criminal court of Jackson county, Missouri, was present in court at the time of the rendition of said judgment, and that the Loraine Brown therein named was the same person as plaintiff in error Leon Brown, in court on the trial of this case.

Neither Shadlow nor Fisher took the stand.

Numerous errors have been assigned by plaintiffs in error. They argue that it was error to refuse Fisher's motion for a separate trial. The ground on which the separate trial was sought was that each of the other defendants had made a confession implicating Fisher. An application for separate trial is addressed to the sound discretion of the court and is not a matter of right. Unless that discretion is abused the decision of the trial court is not subject to review. (*People* v. *Birger,* 329 Ill. 352; *People* v. *Lopez,*

296 id. 438; *People* v. *Covitz*, 262 id. 514.) It is argued that Fisher's affidavit brings the case within the rule laid down in *People* v. *Sweetin*, 325 Ill. 245, and *People* v. *Rupert*, 316 id. 38. In the *Sweetin case* the main ground for the motion was that the defenses of the two defendants were antagonistic. No such ground is stated in the motion in the instant case. In the *Rupert case* each defendant made a statement in which he exonerated himself and implicated the other in the crime. In the instant case each defendant made a confession which not only implicated the others on trial but which was also a confession of his own participation in the crime, and which, in substance, agreed with the confession made by each of the others. The rule is that confessions or admissions of one charged with crime in which a co-defendant is implicated are not competent as against the co-defendant but are competent, when properly restricted, as against the defendant making the admissions, and in a case where a motion for separate trial is made on the ground of confessions of others implicating the mover, a severance should be ordered unless the State's attorney declares that the admissions or confessions will not be offered in evidence on the trial or unless there be eliminated from the confessions any reference to the co-defendant. *People* v. *Bolton*, 339 Ill. 225; *People* v. *Young*, 316 id. 508; *People* v. *Buckminster*, 274 id. 435; *People* v. *Anderson*, 239 id. 168; *McCann* v. *People*, 226 id. 562.

This case differs on the facts from any of the cases above cited. In this case the defenses were not antagonistic and confessions were made by each in substance identical with the others, and if these were competent evidence it was not error to deny Fisher's motion for a separate trial. On a hearing of this motion the court, out of the presence of the jury, heard testimony concerning the circumstances under which the confessions were made. Each of the plaintiffs in error testified that he was mistreated by police officers. Fisher testified that when he was taken over

to the detective bureau he was told that the other men were "squawking" and throwing the blame on him; that if he wanted to clear himself he could do it; that he stated he did not know what the officer was talking about; that he was later taken to the office of commissioner Stege, who asked him if he had anything to say. Upon replying that he did not, Stege slammed the door and a police officer on each side of him took him to the third floor and started questioning him; asked him if he knew Shadlow, Jenkins or Brown; that he told them that he had known Brown two days but did not know Shadlow; told them he did not have anything to say; that one of them slapped him, and one of the other officers kicked him on the shins several times and asked him if he would make a statement; that witness then told him that he would; that they took him to commissioner Stege but that witness did not make a statement, and lieutenant Cusack then took witness to a room off of the supervisor's office, put a pair of handcuffs on his ankles, kicked him and punched him with his fist; that Stege came in and asked how things were going; that Cusack replied, "Haven't gotten anything yet but will before it is over." Stege left, and they beat the witness again so that he told them he would talk to the State's attorney but would not talk to them; that officers Doyle and Sullivan were the ones who struck him; that Doyle struck him with a blackjack, and that then he said he would talk. He testified that he was taken to Stege, who told him that if he implicated Brown, Shadlow and Jenkins he would get out of it by returning to Joliet for a while for violation of parole and that Stege would see that witness would not stay there more than a year, and that Stege would give him his share of the reward given by the bank for the arrest of the men who committed the robbery and murder, but that if witness would not go through with it he would get the same thing he had gotten. He testified that when he was taken before assistant State's attorney Bellows he told him he did not

feel very well—his head hurt. At that Bellows replied, "Just answer the questions and you will be all right;" that in answer to Bellows' questions he told him what he had been told to tell; that he was shown a statement and told to sign it; was told that Brown had made a statement and signed it; that on Sunday, when taken to the bank for a demonstration, he refused to go until struck by Stege and Doyle; that the officers pulled Brown out of the cell and slapped him, and that at the bank they did only what they were told to do. He stated on cross-examination that he answered some questions which the assistant State's attorney asked him but did not answer them truthfully. He did not tell Bellows he had made a statement to Cussack—did not sign any statement; that the signature on the statement was not his writing; that he did not pick out any gun at the bank, and that when he got to the bank Stege and Bellows told him to go over the top of the cage as he did.

Plaintiff in error Brown also testified that when taken to the detective bureau he was told that the rest had confessed and implicated him; that he was taken before the others who said that he was with them, but that he would not make a statement; that Stege then told him he was "in for a killing;" that Stege took him by his collar, led him around to Cusack's office, and there he was hit with a blackjack and slapped four or five times and asked if he was willing to "kick in;" that he replied rather than go through with the punishment he would do anything they wanted him to do; that when he went back into Cusack's office Fisher was there with handcuffs on his arms; that he was asked questions and told them anything they said was true, because he was supposed to say that; that he was instructed to admit the statement, and he did so; that he refused to go to the bank but was forced to by being struck and punished. Shadlow also testified that he had been beaten by Stege and others and was given promises if he would make a statement; that this was before Bellows came

to the station and that he named the other three men because he was compelled to.

The State offered the testimony of lieutenant Eugene Barry. He testified that he did not see anyone strike or abuse the men or offer them immunity or a reward; that at the bank on Sunday, when the men were told to take the positions and the guns they had at the time of the crime, each one took the gun which he said he used and took his position in the bank; that Fisher started over the cage, and Brown said to Shadlow, "That's not the place where you were; it is up further," telling Shadlow to move toward the door, and that this demonstration was made without the men being told what to do. He testified on cross-examination that he was not with the defendants all the time during the afternoon of January 19 but that from three o'clock in the afternoon until midnight he was out of their presence for short intervals, amounting in all to probably two hours; that assistant State's attorney Bellows arrived about five o'clock; that there was a Mr. Sullivan, Dr. McEwen, and a man by the name of Strauss, and sergeant Booth, present; that none of these men complained to the State's attorney or to any of the citizens that they had been mistreated but stated to the assistant State's attorney that they had not been mistreated or promised immunity or a reward, and that they at no time had the appearance of having been mistreated.

Commissioner Stege testified that Shadlow was the first one brought in before him; that he told Shadlow that he had been identified as the man who had taken part in the bank robbery in which a man was killed; that he, the witness, would like to have Shadlow's statement of how many fellows there were in the bureau at that time that took part in the robbery; that Shadlow stood there for a minute or two and he asked him again to tell him, and he said that there were four men aside from himself who were under arrest at that time who took part in it. On being asked if that was all he said "No;" that a short, stocky fellow was

with them but was not arrested; that when Shadlow made this statement the witness called the State's attorney's office and told him they had a man by the name of Shadlow who was confessing, and that around six o'clock the State's attorney and commissioner of police Russell came and Shadlow told them what he told the witness; that the State's attorney then called up his office and assistant State's attorney Bellows came; that he talked to Shadlow, who told him about the other defendants and made a statement confessing his part in the crime; that he at no time committed any violence or abuse against any of the defendants; that though these men were in his charge, no one to his knowledge mistreated them in any way; that they were not threatened or offered a reward, and that each told the assistant State's attorney that he made the confession of his own free will and signed the statement in the presence of a number of persons.

Lieutenant William J. Cusack testified that along about six o'clock he was at the detective bureau when commissioner Stege requested him to talk to one of plaintiffs in error, telling him that he was one of the men in the bank job; that this man was Fisher; that witness asked Fisher if he was one of the men that did the bank job, and he said he was; that the witness then sent for officer Sullivan, who took down his statement on the typewriter as the witness asked questions; that Fisher showed no hesitancy in his examination; that about fifteen minutes after he started questioning Fisher, Stege brought in Brown and requested the witness to take his statement; that he asked Brown if he wanted to make a statement, and he said "Yes;" that witness suggested it would save unnecessary writing to read over Fisher's statement, as far as it had gone, to Brown and ask Brown if it was right, and if it was, to take the statement of the two together; that this was done, and Brown said it was right except as to the length of time he had known Fisher. Statements of both were taken and

signed by them. This witness testified that he did not abuse, strike, threaten or promise these men and that there was no coercion during all the time they were there; that he at no time in any way abused them, and there was no evidence of injury or abuse by anyone, and that after the statements were taken he took them to Stege's room, where the assistant State's attorney also took a statement from them.

Dr. Robert McEwen also testified that he was present on the evening of January 19 when Shadlow, Fisher, Brown and Jenkins were questioned about the crime at the bank; that he heard the questions and answers; that when asked whether they had been mistreated in any way they stated that they had not been but that they were making the statements of their own free will; that all of the defendants stated there was no abuse or promises; that each made his statement willingly and signed the same in the witness' presence; that during the making of the statements one of the defendants was asked if he was hungry, and replying that he was, the officer sent and got some sandwiches and coffee. The State's attorney also stated that he had other officers in court, naming officer Dawe, to testify. The judge expressed himself as satisfied on the hearing that the confessions were voluntary and that plaintiffs in error had not been abused, mistreated or offered any promise or reward.

A motion was made on this hearing to require the State to produce the confessions. The court ruled that it had no authority to require the State to produce them on that hearing. A subpœna *duces tecum* was asked for the court reporter who had taken the statements, directing him that he bring in his notes. This was also denied. The State's attorney stated that he had no objections to the defendants bringing in the court reporter as their own witness. The court ruled that at that hearing it was not necessary or competent.

The finding of the court that the confessions were voluntarily made is assigned as error. We are of the opinion,

under the circumstances here detailed and the testimony appearing before the court at that time, that it was justified in its conclusion that the confessions were voluntary. Nor was it the right of plaintiffs in error on that hearing to have the confessions, or a stenographic report of them, produced, as the only question involved was whether the confessions were voluntary. Refusing to then produce them was not suppression of evidence on the part of the State's attorney. They were later offered on the trial, and the court instructed the jury, as to each of them, that it was admitted only as to the defendant making it; that anything therein stated relating to any other of the defendants than the one signing the confession could not be considered as evidence against such other defendant. An instruction to that same purport was given to the jury on the giving of instructions. In a case such as the instant case, where all of the defendants made voluntary confessions which were in substance the same, and which confessions, though implicating others, were likewise confessions of their own acts, it was not error to admit them as a whole in evidence.

It is also argued that the court erred in admitting evidence of the re-enactment of the crime at the bank on the 20th, the ground on which this error is urged being that the confessions and the re-enactment were not voluntary. A review of the testimony shows, as we have seen, that these confessions were voluntary. The record discloses no protest on the part of any of plaintiffs in error of such re-enactment. Though in the custody of the police, they on arrival at the bank were in the presence of numerous other persons, and when told to take the places occupied by them when they committed the crime and to pick out the gun each used, each selected a gun or guns from the police officer holding the same and took a place in the bank. Had any of the plaintiffs in error desired to protest against the re-enactment, it is but natural that they would have done so while at the bank in the presence of those other than officers.

It is also argued that there is a variance between the indictment and the proof, in that the indictment alleges that Martin *V.* French was killed, while the proof is that the name of the murdered man was Martin *B.* French. There is no merit in this contention, as the middle initial is no part of a man's name. *People* v. *Dear*, 286 Ill. 142.

It is also contended that the trial court should of its own motion have ordered a separate trial for the defendant Melvin Jenkins, for the reason that counsel for Jenkins had stated to the court and other counsel that Jenkins intended to take the stand and admit that he was present and participated in the crime, and that it was known to the court that Jenkins would in his testimony implicate plaintiffs in error. It is argued in support of this contention that as the motion of plaintiff in error Fisher for a separate trial, which was heard on the 13th of April, involved him only, counsel for Brown and Shadlow were not present. The record, however, shows that on April 15, when all of the parties and their counsel were present, a second motion was made by plaintiff in error Fisher for a separate trial. Jenkins did not plead guilty and did not become a State's witness. No motion was made for a separate trial on that ground prior to the commencement of the trial nor at the time when Fisher made his motion for a separate trial. The court did not err in failing to order a separate trial for Jenkins on its own motion, and, as we have seen, Jenkins' testimony was limited to his own acts.

It is also argued that the court erred in allowing improper cross-examination of the defendant Jenkins. In his examination, while confessing to his participation in the crime, he was not permitted to state who was with him except Dixon, who had not been apprehended and who was not on trial. No prejudice to other defendants arose from this cross-examination.

It is also argued on behalf of Brown that the court erred in permitting the State's attorney to interrogate Brown con-

cerning his previous conviction and to introduce in evidence a transcript of certain proceedings in a court of Missouri. The record shows that Brown, contrary to the advice of his counsel, took the stand in his own behalf. On direct examination he testified that he had lived in Chicago about twelve years. On cross-examination he testified concerning his whereabouts in 1920, that he went to the penitentiary in Missouri in March, 1920, for supposed robbery, but that it was not robbery—it was a confidence game. He was then asked, "How was it supposed to be a robbery?" and after objection by his counsel witness said, "I wanted him to ask that; I can explain, judge, why it was supposed to be robbery." The witness then volunteered, over objection of his counsel, to explain his arrest and conviction. No objection was raised to the questions eliciting the answer that he had been in the penitentiary in Missouri in 1920, but Brown testified that in the first four months of 1920 he was in Chicago, and an exemplified copy of the record of the court in Missouri charging one Loraine Brown with robbery and showing his commitment to the penitentiary on March 19, 1920, was introduced in evidence. The witness J. E. Gorman identified plaintiff in error Brown as being the same man who under the name of Loraine Brown was there sentenced to the penitentiary. The record offered in evidence was proper rebuttal as to his whereabouts and for impeachment.

Plaintiffs in error rely on *People* v. *Garippo,* 321 Ill. 157, as supporting their contention that this evidence was error. That case is not analogous to the instant case on the facts. Here plaintiff in error Brown voluntarily took the witness stand in his own defense and testified that he was in Chicago during the time when the record shows he was in the penitentiary in Missouri. On cross-examination, as we have seen, without objection he stated he was in the penitentiary in Missouri for a supposed robbery, though it was, in fact, a "con game." Section 6 of division 13 of

the Criminal Code provides that conviction of a crime does not operate to disqualify one as a witness in any criminal proceeding but such conviction or interest may be shown for the purpose of affecting his credibility. Brown, while voluntarily testifying, placed himself within the statute and was therefore subject to be discredited the same as any other witness. The introduction of the record of his conviction was a proper method of discrediting him.

It is also argued with great earnestness that the court erred in admitting in evidence the bullet known as exhibit 22 and in permitting the witness Calvin Goddard to testify concerning results of certain experiments which he made with that bullet, and by which, as he testified, he determined that the bullet was fired from one of the guns offered in evidence and identified as the gun in the hands of one of the plaintiffs in error. The basis of the objection to the admission of the bullet is, that it was shown by Dr. Kreuscher that when he took it from the body of the deceased he gave it to a Sister in charge of the operating room at the hospital; that he placed no marks of identification on it and did not see it again until some time later; that the Sister to whom the bullet was given did not testify, and there was no evidence that this exhibit was the same as that which the doctor removed from French's body; that this was likewise true of exhibits 23 and 24—23 being part of a shot-gun wad taken from the body of the deceased and 24 being a small memorandum book taken from the hip-pocket of the deceased. Dr. Kreuscher, in addition to testimony pointed out in the argument of counsel for plaintiffs in error, when recalled testified directly that exhibit 22 was the bullet which he removed from the body of Martin French; that he did not put a mark on it because he never put marks on articles of that kind. He was not asked, however, by what means he was able to give positive identification of the bullet, nor were facts, if they existed, brought out on cross-examination which would tend to show that he did

not, in fact, know it to be the same bullet. His positive testimony that it was the same bullet was not impeached on cross-examination, and it was therefore not error to introduce it in evidence. The same is true as to the felt wadding, exhibit 23, and the memorandum book, exhibit 24, which he testified he took from the pocket of French. Exhibit 24 showed that a bullet had passed through it.

Coroner Herman Bundesen testified that he saw the bullet marked People's exhibit 22; that it was brought into his office by the police sergeant; that he examined it and turned it over to Calvin Goddard for examination; that it was in the same condition at the time of the trial as it was when he turned it over to Major Goddard.

Calvin Goddard testified that he was a consultant on small arms and projectiles in civil and criminal cases; that he devoted all his time to that work. In qualifying him as an expert the People showed that he held an A.B. and M.D. degree from Johns Hopkins University; that he is a graduate of the Army Medical School in Washington, a lieutenant-colonel in the ordnance reserve of the United States army; that he had served on the faculties of Johns Hopkins and Cornell Universities; that at the age of fifteen he began visiting munition factories and since that time has studied their methods of manufacture; that in the two years immediately prior to his testimony he had visited and re-visited practically every manufacturer of fire-arms and small arms ammunition in the United States and had studied the methods of all the factories; that as an ordnance officer he had been on duty at government arsenals and taken part in the manufacture of fire-arms, revolvers, pistols, and ammunitions used in such arms and the powders which enter into such ammunition; that he had studied the literature of all available languages concerning arms, and collected over a period of many years necessary data and specimens which figure in his identification work; that he had been consulted as an expert in homicide cases in more than one-half

the States in this country and had testified to his findings in a large percentage of cases; that during the year of the trial he had testified in fifteen or twenty cases requiring the identification of fire-arms; that he had been consulted as an expert by the State and Treasury departments of the United States government and by experts of foreign nations; that he had among his advisers and associates the professor of mathematics of Stevens Institute of Technology in Hoboken, the ex-dean of the pyrotechnical school of the ordnance department of the army, an ex-member of the Bureau of Standards of Washington, one of the officers of the Lyman Gun-Sight Corporation and the ballistic engineer of the DuPont Powder Company. He testified that he had thousands of unfired and fired bullets and shells, scores of specimens of different types of powder used in small arm ammunitions, many hundreds of specimens of arms which he used for comparison and reference work, numerous instruments of precision in the form of microscopes, gauges, micrometers, photographing apparatus, many of which had been developed exclusively for his use; that he also had statistics covering the manufacturing specifications of many thousands of arms in common use in this country and overseas and also covering many obsolete arms no longer in production. He testified that by examining a bullet it was possible to determine what company manufactured it; that it was also possible to determine from the examination of a fired bullet what make of gun fired it, and also to tell the exact gun which fired the bullet if the gun was available for examination. He explained how it was possible to tell, by examining a fired bullet, what company had made the bullet and the make of gun from which it was fired. He explained that he had fired a bullet from the .38-calibre Smith & Wesson revolver, in evidence as exhibit 17, into a barrel filled with waste; that by placing the test bullet, together with the one introduced in evidence, under a microscope he was able to determine

the same character of markings, same width and angle of grooves made by the rifling of the gun, and by such manner determine that the gun, exhibit 17, fired the bullet. He explained that no arms maker makes exactly the same kind of rifling grooves in the barrel of its guns as is made by other manufacturers, and that by reason of the dulling of the tool before the grooves are completed the grooves will show, under the microscope, some difference in the same gun from every other gun of that make and some difference in the grooves in the same gun, and as a bullet fired through that gun takes on markings corresponding to the exact grooves of the rifling of the barrel, it is shown by the microscope that no gun other than the one from which it was actually fired could make such a mark on the bullet. As to the exhibit in this case, he showed that the cartridge had been loaded with black powder; that the gun, exhibit 17, also showed that it had fired black powder; that the inside of the barrel and cylinder were fouled with black powder; that though this bullet, exhibit 22, was flattened at the end by reason of apparently having struck a bone, his microscopic examination disclosed that the bullet bore rifle marks identical with the bullet which the witness fired from exhibit 17. He also testified that on the end of the bullet were small particles of the materials of which the memorandum book was made, indicating that the bullet had passed through the book. This book, exhibit 24, showed that a bullet had passed through it.

It is argued that this testimony was novel and should not have been admitted; that it was not within the field of expert testimony; that such evidence is not admissible under the common law and no statute of this State authorizes its admission. The same objection was raised in *People* v. *Jennings,* 252 Ill. 534, to the admission of finger prints as means of identification. So the same question was raised when photography was first introduced. (1 Wigmore on Evidence, sec. 795.) Of such evidence it was said in *People*

v. *Jennings, supra,* that while it may or may not be of independent strength, it is admissible, the same as other proof, as tending to make out a case. The general rule is that whatever tends to prove any material fact is relevant and competent. (*People* v. *Gray,* 251 Ill. 431.) Expert testimony is admissible when the subject matter of the inquiry is of such a character that only persons of skill and experience in it are capable of forming a correct judgment as to any facts connected therewith. (*People* v. *Jennings, supra.*) Such evidence is not confined to classified and special professions but is admissible wherever peculiar skill and judgment applied to a particular subject are required to explain results by tracing them to their causes. Such evidence is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions founded on such knowledge and experience an aid to the court or jury determining the issues. (*People* v. *Jennings, supra; Yarber* v. *Chicago and Alton Railway Co.* 235 Ill. 589; *Evans* v. *People,* 12 Mich. 27; *Taylor* v. *Monroe,* 43 Conn. 36; *Ellingwood* v. *Bragg,* 52 N. H. 488; *McFaddon* v. *Murdock,* 1 Ir. Rep. (1867) Cl, 211; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 280.) The question of the qualification of an expert rests largely in the discretion of the trial court. *Bonato* v. *Peabody Coal Co.* 248 Ill. 422; 3 Wigmore on Evidence, sec. 1923.

In *Lyon* v. *Oliver,* 316 Ill. 292, it was pointed out that handwriting, photography of questioned documents and identification of typewriting were subjects for expert testimony. It was in that case shown that the same typewriter might, after considerable use, register letters of different form from that which it would make of the same letter when the machine was new, and that whether this has occurred in any given case is a subject for expert testimony. We are of the opinion that in this case, where the witness has been able to testify that by the use of magnifying in-

struments and by reason of his experience and study he has been able to determine the condition of a certain exhibit, which condition he details to the jury, such evidence, while the jury are not bound to accept his conclusions as true, is competent expert testimony on a subject properly one for expert knowledge.

It is also argued that this testimony should not have been admitted because the experiments were made out of the presence of the defendants. Experiments of that character are similar to an analysis made by chemists to ascertain the presence of poison, and like experiments. It has never been held, so far as we are aware, that such experiments must be made in the presence of the defendant.

It is also argued that certain demonstrations which the witness made before the jury on a blackboard were incompetent. Such demonstrations are similar to a plat. The demonstrations were explained by the evidence of the witness, and a photostatic copy of the markings on the blackboard was included in the bill of exceptions. It was not error to permit this demonstration.

While the evidence shows that French died of wounds received from a shot-gun and that the bullet which was the subject of Goddard's testimony did not contribute to his death, it was competent to consider such bullet for the reason that, as the evidence shows, guns were fired by the officers and employees of the bank, and the evidence concerning the bullet therefore tends to show that French was not shot by one of his fellow-employees. For this purpose the guns used by officers and employees of the bank were also admitted in evidence, and plaintiffs in error complain that this was error. The purpose of such offer was to show that none of the employees were using the kind of gun with which French was killed, and for that purpose they were competent. In addition, it was shown by the confession of each of the plaintiffs in error just what gun each one used, and the matter is not controverted in this record. The

same may be said of exhibit 23, which the witness Goddard identified as being a shot-gun wad made by and used by the same company which made the discharged shells found in the automobile, together with the sawed-off shot-gun. The record shows but one shot-gun was used at this time, and that, according to the State's witnesses, was in the hands of Shadlow, and according to the confessions was in the hands of Dixon, the man who was not apprehended. That testimony was competent for what it was worth.

Counsel for plaintiffs in error cite *People* v. *Berkman,* 307 Ill. 492, as supporting their contention that Goddard's testimony is not a proper field for expert evidence. The facts in that case were in nowise as full as in the case at bar. There was no evidence in the *Berkman case* to show the different rifling of guns or to qualify the witness as an expert in such matters.

Objection is made to the admission of the testimony of Goddard that he was able to tell by the shot-gun shells found, and the sawed-off shot-gun offered in evidence, that the shells were fired by that gun. He explained that under a microscope the imprint of the firing pin of the shot-gun in evidence was unmistakably shown on the caps of the discharged shells found in the automobile. He explained that no two firing pins make exactly the same impression, but that the small rings made in turning out the point of the firing pin are shown under the microscope to vary in each instance, and that the rings formed in the imprint on the cap of the shells fired in this case were identical with the rings shown under the microscope on the firing pins of the shot-gun in evidence. Such evidence was competent for what is was worth.

It is also argued that prejudicial error was committed by permitting four of the jurors to become separated from the balance of the jury during the time of the trial. The affidavit concerning this matter, filed on motion for new trial, is to the effect that four members of the jury were taken by

a deputy sheriff to a store for the purpose of purchasing clean clothing. The affidavit sets out that they there had an opportunity to come in contact with others outside and were influenced. By counter-affidavit the deputy sheriff in charge of the jury throughout the trial stated that these four jurors had not received clean clothing from home and he at their request took them to a store to purchase clean clothing; that they were at all times in his presence and did not talk to anyone about the case they were trying or any other case, and no one talked to them. Complaint is also made that the jury were permitted to have a radio in the jury room, and that they tuned in on different stations, particularly W G N, during which time they heard the broadcasting by the police department of robberies and murders. The counter-affidavit of the deputy sheriff admitted that a portable radio was taken from his home and placed in the jury quarters and denied that they heard any broadcasting of robberies, murders or other crimes but that they listened to musical programs from other stations. It is also set out in plaintiffs in error's affidavit that a feast was given at the expense of one of the jurors on the evening of one of the latter days of the trial. The counter-affidavit shows that on this particular evening the jury asked the officers if they might not have chicken instead of steak, which was assented to by the officer and produced, and that one of the jurors suggested the (at that time) luxury of strawberries and that he would pay for them if the officers would buy them, and that this was done. This seems to be the substance of the feast. There is no fact averred in these affidavits showing any prejudicial result or injury to plaintiffs in error. In order to constitute grounds for setting aside a verdict of a jury on account of conduct of the jury it is necessary that a showing be made that the defendant was prejudiced by the separation of the jury or such conduct. (*People* v. *Rogers,* 303 Ill. 578.) No such showing is made in this record, and while under the law of this State the

jury are required to be kept together, free from communication with outside influence, during the trial of the case, and the deputy sheriff should not permit them to separate, even for the purposes here existing, without consent of the court, it is quite evident from the facts as shown by the affidavits that no injury resulted to plaintiffs in error. Plaintiffs in error contend that they should have had the opportunity to make further proof of prejudice in this regard. No statement of what they wished to prove was made and the affidavit gave no indication of the existence of such proof. It was not error to deny their motion.

It is also earnestly argued that the court erred in giving to the jury, prior to the commencement of the examination of jurors on *voir dire,* oral instructions concerning the law. It appears from the record that a panel of jurors had been called for two weeks' service. Twelve jurors had been called into the box for examination. The statement made by the court was evidently addressed to the entire panel. The judge told them that they were called to give up their time in behalf of the enforcement of law; that the jurors would be told by lawyers for the State, and likewise for any defendants, that every defendant is presumed to be innocent until found guilty. An indictment against a defendant is not reason for believing him guilty. The indictment is only the finding by a grand jury on hearing one side of the case, where the defendant was not heard; that the defendant is presumed innocent until found guilty beyond a reasonable doubt; that much would be said to them about reasonable doubt, but the words were self-explanatory; that they all knew the meaning of the words "reasonable" and "doubt;" that the jury would be told in any case where the charge was murder that the jury had a right to fix the punishment; that the definition of "murder" would be given to them and the punishment left to the jury; that they had a right to fix that punishment either at death, life imprisonment or for a term of not less than fourteen years, if they found

him guilty; that they would be asked whether they had any conscientious scruples against the infliction of the death penalty in a proper case; that by that is meant whether the jury can conceive of a case where, in their opinion, the punishment should be fixed at death—that is what is meant by "proper case;" that it does not mean that every murder case presented warrants the death penalty but that they would be asked that question nevertheless, because if it be disclosed that a juror has an aversion to fixing the death penalty in any event, such juror could not conceive of a crime of murder, however atrocious, which would warrant the infliction of the death penalty; that the law in the State is that the death penalty may be fixed; that it has been the law as long as the State has existed; that when a juror is asked whether he has any conscientious scruples against the fixing of the death penalty in any case and replies that he has, he is disqualified, meaning that notwithstanding the legislature has fixed that as a law such juror does not believe in enforcing that law. The jury were also told that, aside from murder, the only times they would be called on to fix the penalty was in case of rape; that in all other cases,—robbery with a gun, burglary, larceny, etc.,—the statute fixed the punishment and the jury have nothing to do with it. Their sole duty in such cases is to determine whether the defendant is guilty or not guilty. They have nothing to do with the punishment. He further stated regarding punishment of such cases as robbery, burglary and larceny: "If in your opinion the punishment seems excessive, that should not influence you in deciding as to whether or not a defendant is guilty or innocent; that is my work; that is the burden of the Board of Pardons. In any case where you find a man guilty this court always has the right or opportunity of setting that verdict aside, or if the punishment is excessive and the facts in the case do not warrant that the punishment fixed by the statute should be carried out to a defendant found guilty by you, this court has a right

to put that defendant on probation. Likewise in cases of that character we have what is known as the Board of Pardons and Paroles, and every defendant found guilty and sent to the penitentiary for one year or ten years or life, or whatever number of years he has been sent for, after eleven months such defendant has a right to have his case heard by the Board of Pardons, who may parole him after eleven months, and therefore when you are instructed as to the punishment in any particular case over which you have no control you shouldn't let your conscience bother you."

No motion was made to discharge the panel by reason of these remarks. But one of the twelve jurors in the box at the time served in the case. He was examined and accepted by plaintiffs in error's counsel. The peremptory challenges allowed plaintiffs in error were not exhausted in the selection of the jury. Two objections were made to the remarks. Counsel for one of plaintiffs in error objected to the statement of the court that it could set a verdict aside if the jury found a man guilty. Another of defendants' counsel objected to the court's discussion of the Parole law. It is argued that while these remarks were addressed to the entire panel, as a matter of fact this case required ten days for trial, and the jury could not avoid applying the court's remarks to the particular case. As we have seen, the only remarks objected to were those herein quoted, and it is evident the jury could not have construed them as having application to this case. Likewise it is apparent from the reading of the statements of the court with reference to the right of the court to set aside a verdict, that they related to those cases in which the jury have nothing to do with the punishment and would be so construed by the jury. We are of the opinion, therefore, that the statements made could not have prejudiced plaintiffs in error.

It is argued, however, that section 73 of the Practice act provides that no instructions shall be given to a petit jury except in writing, and that this was a violation of that

statute. It cannot be doubted that had oral instructions been given to the jury, after they were sworn to try the cause, which pertained to this case, the argument and objection of counsel for plaintiffs in error would be well founded. No cases have come before this court where the practice, frequently indulged by trial judges, of making a general statement to a panel of jurors on their induction into service has been brought in question. We have no doubt that remarks intended to be general in their nature, but which, however, are so made as to cause the jury to feel, on hearing the evidence of a particular case, that they were intended to be applied to that particular case, would be prejudicial and erroneous. The jury in each case tried receives specific written instructions concerning the case tried by them and their duty pertaining thereto, and any juror of average intelligence understands that it is his duty to follow such written instructions. The statement here questioned was general and stated the rights of any defendant as fully as those of the State. Such practice on the part of the trial court is not to be commended, and should be indulged, if at all, with great caution, and in this case were we able to discern in the statement made any prejudicial effect against plaintiffs in error, we would, since the jury fixed the punishment, be constrained to grant a new trial. We are, however, unable to see wherein such prejudice existed. It cannot be doubted that after the jury is accepted and sworn to try a case, there can, in this State, be no oral instructions to the jury as to the law governing that case, since the statute requires that instructions to petit jurors shall be in writing. We are of the opinion, however, that for the reasons given this was not a violation of that statute. The jury were fully instructed by the written instructions given concerning their duty under the law in this case and no objections to such instructions are urged here.

It is contended that the court erred in expressing an opinion as to facts in the presence of the jury. We have·

examined the record and it discloses no objection of that character to anything said by the court, and also that the court exercised extreme care in this long record to avoid prejudicial remarks, though fully one-half of the transcript is taken up with objections of counsel, many of them not directed to a point of importance in the case.

It is also argued that the conduct of Jenkins in pleading not guilty and then taking the stand and admitting his part in the robbery was prejudicial to plaintiffs in error. This was not a matter over which the court or State's attorney had any control, and, as we have pointed out, he did not in his testimony mention plaintiffs in error. This objection is without merit.

It is also contended that the closing remarks of the State's attorney were prejudicial. The abstract discloses but one objection, and that was to the remark of the assistant State's attorney that he had talked with the witnesses. He did not attempt to say what the witnesses told him in such conversations, and on objection did not pursue the matter. The statement, while it should not have been made, could not have been prejudicial.

Counsel lastly argue that the evidence is insufficient to sustain the verdict of the jury. We are of the opinion that the evidence shows the guilt of plaintiffs in error beyond all reasonable doubt. It was established without controversy that there was a robbery of the bank on January 18, 1929, during which Martin French was slain and two of the officials of the bank wounded. The participants in this robbery were shown, not only by identification but by confessions of plaintiffs in error, to be Shadlow, Fisher, Brown, Jenkins and Dixon, the last one of whom escaped. Hare, who was indicted jointly with them, was allowed a separate trial. Shadlow was identified by numerous witnesses. Brown and Fisher were identified by two witnesses. Jenkins' participation in the affair was admitted by him on the stand. The confessions of plaintiffs in error were voluntary. Notwith-

standing this, the question whether their confessions were voluntary was submitted to the jury under instructions most favorable to them. Brown took the stand and testified in an attempt to explain where he was on the morning of the robbery, naming his brother and a man by the name of Hoffman as knowing his whereabouts, but neither was produced at the trial. It is evident from the record of his testimony that the jury, who heard him testify, considered his testimony and saw his demeanor on the witness stand, were justified in disbelieving his statement. The jury were fully instructed and no instructions are here complained of. Notwithstanding the seriousness of the consequence to these plaintiffs in error, we are unable, after the close scrutiny of the entire record demanded by the seriousness of the case, to escape the conviction not only that these defendants were proved guilty beyond a reasonable doubt but that they have been accorded a fair trial under the law.

The purpose of reviewing a judgment of conviction in a criminal case is to determine whether the defendants have had a fair trial under the law, whether their conviction is based on evidence which properly established in the minds of the jury, beyond a reasonable doubt, the guilt of the accused, and whether errors, if any are found in the record, could reasonably have affected the result reached by the jury. If the law is shown to have been fully met it is the duty of this court to affirm the judgment. *People* v. *Anderson, supra; People* v. *Cardinelli,* 297 Ill. 116; *People* v. *Haensel,* 293 id. 33.

The judgment of the criminal court of Cook county is affirmed, and the clerk of this court is directed to enter an order fixing July 25, 1930, as the date on which the original sentence entered in the criminal court of Cook county shall be executed. A certified copy of the order shall be furnished by the clerk of this court to the sheriff of Cook county.                    *Judgment affirmed.*