(No. 21719.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARLO CONIGLIO, Plaintiff in Error.

*Opinion filed October 21, 1933—Rehearing denied Dec. 7, 1933.*

A. M. Fitzgerald, L. W. Ensel, and William J. Lawler, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Wilford H. Absher, State's Attorney, and J. J. Neiger, (Hugh Green, of counsel,) for the People.

Mr. Justice Jones delivered the opinion of the court:

Carlo Coniglio, defendant, was convicted in the circuit court of Morgan county of the murder of Walter Massey and his punishment was fixed at sixteen years in the penitentiary. He brings the record here for review.

Walter Massey was proprietor of a lunch room and filling station, known as the South Side Inn, on the west side of State highway No. 3, about three miles south of the public square in Jacksonville. Between 12:00 o'clock, midnight, on September 23, 1931, and 1:00 o'clock in the morning of the following day, he was shot and killed in an attempted "hold-up" at the lunch room. The South Side Inn consists of two small buildings. One is used as a light and power house and is located just north of the lunch room building. The latter contains three rooms—two on the south side and one on the north. The southeast room has a front entrance door on the east side, near the southeast corner. The southwest room is a kitchen, with a door into the southeast room nearly opposite the front entrance

door. There is a double door leading from the southeast room into the north room and also a door leading from the kitchen into the north room. On the night of the murder there was a counter along the west side of the southeast room, with an ice-box in the northwest corner and one in the northeast corner. There were two tables, six chairs and a stool, the stool being up against the counter, toward the north end. A space of about eighteen inches was between the north end of the counter and the ice-box in the northwest corner. A sixty-watt light in the southeast room was about six feet from the stool and another light was in the kitchen. Gasoline pumps, with space to drive on each side, were located to the northeast of the building. There were two lights on the pumps, four large lights on poles with reflectors, and lights on the north, east and south sides of the building. All of the lamps were lighted.

Maurice Bond testified that he was an employee at the filling station and lunch room; that he was sitting on the ice-box in the northwest corner of the lunch room talking with Walter Massey, who was standing behind the counter; that about 12:30 o'clock A. M. a Chevrolet coupe came from the south and drove past the entrance door; that there were two men in the car; that one of them came in and ordered a "hamburger;" that he wore no hat; that the other man stayed outside and the motor was left running; that the man who came in was the defendant; that he came over and sat down on the stool at the north end of the counter; that witness looked at him about five minutes as he sat on the stool, not more than five feet away; that Massey went into the kitchen to prepare the hamburger, then went to the ice-box on the east side of the southeast room and then back into the kitchen, where he started pumping up the gasoline stove; that witness went into the kitchen to help Massey and told him, "Those guys look kinda suspicious." On a motion by defendant the court excluded this statement. Bond further testified that another car with

two men drove up to the station and Massey told him to go out and service it; that he sold them five gallons of gasoline; that while he was pumping the gasoline he observed the license number on the Chevrolet coupe and took down the number in his mind; that it was a 1931 Illinois license with six figures; that the number started with a "6" and had a "7" in it; that the license plate was about fifteen feet from him; that there was a good light and he could see it plainly; that it was all shined and had one headlight lighted; that as he went out to serve the two customers defendant got up and went to the south window; that when the customers drove away witness went inside just as Massey put defendant's hamburger on the counter; that defendant came to the counter and sat down; that his companion got out of the car and was standing at the east door; that as this man started in witness went to the kitchen to put down the license number, but, remembering that he had no pencil, started into the other room to get one; that because of subsequent events he did not make a note of the license number; that defendant came around the counter with a gun and ordered him back into the kitchen, and he obeyed; that he was about two feet from Massey and about five feet from defendant; that Massey was standing in the kitchen and picked up his gun; that as he did so defendant shot him; that Massey shot at defendant and his companion, and there were six or eight shots fired; that defendant was in the building about ten or fifteen minutes; that the two men drove off north; that witness put Massey in an old Ford car and tried to start it; that he hailed a truck that came along but it did not stop; that he finally got the Ford started and took Massey home; that he then went back, closed the filling station and went to the sheriff's office; that he did not tell the two customers whom he served that he was suspicious of defendant and his companion, because he was afraid they would laugh at him and he did not know but they might all be asso-

ciated; that he lived on the Vandalia road, about ten miles from Massey's filling station, and did not see Massey from the time he was shot, on Wednesday, until the following Saturday, and that he went to work on Monday after Massey was buried.

Defendant was arrested in Springfield and was taken to the police department. He was placed in a shadow-box and observed by Bond about five minutes. Bond was in the dark and the shadow-box was brilliantly lighted. Bond testified that the moment he saw defendant he knew he was the man who shot Massey and almost fainted, meaning that he got dizzy. Defendant was then taken out of the shadow-box and Bond sat across a table from him in a well-lighted room for about ten minutes. Bond was at the police station about fifty minutes and went home with the sheriff of Morgan county. During that time he did not tell the officers defendant was the slayer of Massey. The homicide occurred on Wednesday. The exhibition of defendant in the shadow-box was one week later. On the following Monday Bond told the sheriff he was sure defendant was the slayer. On cross-examination he testified he told the police officers at Springfield he was not sure defendant was the man because defendant's brother was there, and, while he was sure defendant was the slayer, his mother had told him not to identify anyone and that it was unsafe to do it, and he was afraid.

Benjamin Nunes was a cook in a restaurant at Whitehall, on State highway No. 3, about twenty-five miles south of Jacksonville. He testified that on the night of September 23, 1931, between 11:00 and 12:00 o'clock, two men came into the restaurant; that one of them wore a cap and ordered two fried ham sandwiches to be taken with him and a pork sandwich which he ate there; that the other man wore no hat, and he ordered a hamburger. Witness stated that defendant bore a resemblance to the man who bought the hamburger. Dempsey Collins, a waiter in

the restaurant, testified to the same facts, except that he did not know whether defendant was one of the men he served or not.

L. Arch Vasconcellos, chief deputy sheriff of Morgan county, testified that on October 12, at the jail, he asked defendant why it was his sister wanted to know who had told on him, and defendant replied, "I just wanted to know who told on me." Witness also said that he asked defendant where he was on the night of September 23 and 24, and defendant replied he did not know; that witness asked him the same question at different times and received the same reply, but later defendant told him he was at the Flatt Tire shop, in Springfield, on that night.

C. J. Wright, a deputy sheriff of Morgan county, testified that he talked to defendant at the county jail about October 10, 1931, and defendant said he did not know where he was on the morning of September 24 about 1:00 o'clock and did not know where he was on the 23d or 25th.

Fletcher J. Blackburn, sheriff of Morgan county, testified that when defendant and Bond were seated at the table at the Springfield police station defendant did not look squarely at Bond but just glanced at him from time to time. He also testified that he saw defendant's Chevrolet coupe on September 30, 1931; that it was sitting in front of the house where defendant's father lived, and had a 1931 Illinois license plate No. 657287. He testified that Wright asked defendant where he was on the night of the murder and that defendant said he did not know. After he had been put in jail the sheriff said he asked him the same question and he again replied that he did not know.

Jesse VanCleve stated that between half-past twelve and a quarter to one o'clock A. M. on September 24 he was driving into Jacksonville from a dance at Alexander, on the hard road from Jacksonville to Springfield; that at its intersection with South Main street a Chevrolet coupe, with two men in it whom he did not know, came around the

corner from the south at a high rate of speed, forcing him up onto the north curb of the street.

William C. Shafer, a police officer in Springfield, swore that he and another officer arrested defendant on Adams street, in Springfield, between Sixth and Seventh streets, about 10:30 o'clock in the morning of October 9; that defendant was driving a new Ford sedan; that they learned from him he had bought it from a dealer named Jennings about October 5 and traded in a dark-colored Chevrolet coupe in good condition, with disc wheels, and that they went to Jennings and found the coupe.

George Benson, a motorcycle police officer of the city of Springfield, was called by defendant and testified that he was on duty at Anderson's dance hall in that city on the evening of September 23 from 9:00 o'clock to 12:00 o'clock; that when he left the dance hall, about ten minutes later, he went north on the east side of Fifth street from Edwards street to Monroe street; that he saw a man in an automobile who he thought was the defendant; that the occupant of the car spoke to him, and the witness answered, "Hello, Dage." On cross-examination Benson testified, "I am not telling the jury positively that I saw the defendant."

Vaughn Beghtol, night manager of the Checker Cab Company in Springfield, testified that on the night of September 23, at 12:35 o'clock, he left his office on East Jefferson street, across from the St. Nicholas Hotel, and drove his car south on Fourth street as far as Washington street; that he saw defendant having trouble with his car; that defendant told him the battery was down; that he drove behind defendant's car and pushed it a few feet; that defendant's car started and turned to the left and witness turned to the right. He did not see defendant again that night.

Benjamin Lundon, engaged in the insurance business at Springfield, and Sam Smith, proprietor of the Flatt Tire Company, at 322 East Jefferson street, in Springfield, testi-

fied that on September 23 they were in Smith's place of business and about 11:30 P. M. engaged in a card game; that defendant came there between 12:30 and 12:45 A. M. with a dead battery in his car, which Smith replaced with a rental battery. Smith testified he tried to sell defendant a battery, but defendant told him he was going to trade his car and did not want to invest in a battery. The witness produced and identified a record of the transaction and testified it was made on the morning of the 24th after defendant left there, about 1:00 o'clock. Lundon had known defendant for about a year. Smith testified he knew defendant for six or seven years and that he came to his place quite often.

William Sheridan and Max Downing testified that they drove from Champaign to Downing's home, in Jerseyville, a day or two after September 21; that they left Champaign in the evening about 8:00 o'clock and stopped at the South Side Inn, at Jacksonville; that they were there at about 12:30 or twenty minutes to 1:00 o'clock and got gas and checked the oil; that there was no Chevrolet coupe at the station at that time; that on the return trip from Jerseyville the next morning they noticed some crepe on the gasoline station and drove on into South Jacksonville, where they learned of the killing. The evident purpose of this testimony was to contradict Bond, who had said he had serviced a car while defendant's car was standing in front of the lunch room. There is nothing except the proximity of time to indicate that the car Bond referred to was the Sheridan car. For all that appears, the testimony of each of the witnesses on this subject may be true. Bond never claimed the Sheridan car was at the station while the slayer's car was there. Sheridan's car may have been serviced before the arrival of the other car. However that may be, several witnesses in rebuttal testified that both Sheridan and Downing stated the next morning that they had seen a coupe there.

Bessie E. Woods, proprietor of a restaurant in Jacksonville, testified that on the night of the murder she drove to Roodhouse from Jacksonville, reaching there at about 11:30 and left Roodhouse about 12:00 o'clock for Jacksonville; that on her way home she stopped at the South Side Inn, directly in front of the filling station; that she saw Maurice Bond and Walter Massey; that there was another car at the north end of the filling station with a Missouri license; that two men came out of the filling station; that one of them came out with Massey and got into the car; that they seemed to be arguing, and the man said to Massey, "You had better take care of that;" that Massey replied, "I am not going to do it," to which the other man replied, "You'd better;" that the Missouri car stayed there a few minutes and drove away toward Jacksonville; that she then drove toward town and saw the Missouri car turn around and go back south. Bond and Enos Massey testified Bessie Woods was not at the station on the night of the killing. Two justices of the peace, a constable and the water superintendent of the city of Jacksonville testified that the general reputation of Bessie Woods for truth and veracity in that neighborhood was bad. The defendant did not testify in his own behalf.

It is contended that the trial court erred in refusing defendant's motion for a continuance. His affidavit in support of the motion alleged that Pete Campo, of Springfield, would testify, if present, that Maurice Bond, the only eyewitness to the killing, said after the first trial that he was not positive Coniglio was the man who shot Massey; that that was his belief and best judgment but he could be mistaken; that the whereabouts of Campo has become unknown to defendant, but immediately upon learning that the case was to be set for trial defendant began a diligent search to endeavor to locate Campo so that a subpœna might be served upon him, and that he believes Campo can be found and will be present to testify at the next term of

court. No showing was made of any attempt by defendant to keep informed as to Campo's whereabouts or to locate him until defendant learned his case was again to be set for trial. No fact is alleged in the affidavit as a basis for believing Campo's attendance could be procured at the ensuing term. It is essential that an affidavit in support of a motion for continuance shall show diligence to procure the attendance of an absent witness and that it shall state facts exhibiting a reasonable ground to believe the attendance of the witness can be procured at the next term. In the absence of such showing the motion was properly denied. *People* v. *Williams,* 309 Ill. 492; *People* v. *Wood,* 306 id. 224; *People* v. *Donaldson,* 255 id. 19.

Defendant contends that upon consideration of the whole evidence there is a reasonable doubt of his guilt, and that the testimony produced by the State itself raises such a doubt. Bond positively identified defendant as the slayer of Massey. According to his testimony defendant was at the filling station ten or fifteen minutes and sat within a few feet of him in a well-lighted room for at least five minutes before the tragedy. Nunes and Collins did not positively identify defendant as one of the men they saw in Whitehall, but their description of the men they saw corresponds with Bond's description of the slayers. The crime was committed at a time when an automobile leaving Whitehall at the hour mentioned by Nunes and Collins and traveling over Route No. 3 would ordinarily reach the place where Massey was slain. The car in which the murderers drove into the filling station came up that road. The make and style of the car, the initial figure and the number of figures on the license plate correspond with the description given of defendant's Chevrolet coupe. Within a few minutes after the killing a Chevrolet coupe with two men in it came rapidly from the direction of the crime and turned into the Springfield road, forcing another car onto the curb. After defendant's arrest he repeatedly said he

did not know where he was on the night of the crime. Later he told a deputy sheriff he wanted to know who had told on him. Two of the witnesses for defendant were impeached without any attempt at rebuttal. Bond's identification of defendant at the time of the trial was positive. There was other testimony tending to corroborate him. The testimony of the alibi witnesses was in many respects uncertain and unsatisfactory.

In *People* v. *Herbert,* 340 Ill. 320, we said that the law has committed to the jury the determination of the credibility of the witnesses and of the weight of their testimony, and where there is sufficient evidence to convict and it cannot be said that the verdict is palpably contrary to the weight of the evidence or that the evidence is so unreasonable, improbable or unsatisfactory as to justify a reversal on that ground, the Supreme Court will not substitute its judgment for that of the jury and reverse a conviction merely because the evidence is conflicting. After considering the defense of alibi in *People* v. *Vozel,* 346 Ill. 209, it was held that the determination in such a case is for the jury, which alone has the duty and the responsibility of weighing the evidence and determining the credibility of witnesses. The law as announced in those cases is applicable to the case at bar. We cannot say that the verdict is palpably contrary to the weight of the evidence in this case or that the evidence is so unreasonable, improbable or unsatisfactory as to justify a reversal on that ground. It is the peculiar province of a jury to weigh and consider the evidence and determine the weight that should be given to the testimony of the respective witnesses. The evidence as a whole was sufficient to warrant the verdict, and this court will not substitute its judgment for that of the jury in weighing the credibility of witnesses. *People* v. *Greenig,* 342 Ill. 254; *People* v. *Barber,* 342 id. 185.

Complaint is made that counsel for the prosecution in his argument stated that counsel for the defense were as-

sociating with Bessie Woods and that she was of their type. The remarks relative to counsel's association with Bessie Woods were improper and were objected to, but no request was made for any ruling by the court. Unwarranted and uncomplimentary references to opposing counsel are unethical and may be cause for reproof, but unless prejudice to the defendant is their probable result the verdict will not be disturbed.

It is complained that counsel for the prosecution insinuated to the jury that it was the purpose of the defense to have the jury believe Maurice Bond was the man who actually killed Massey. On the cross-examination of Bond counsel for the defense interrogated him as to whether there was any rivalry or trouble between him and Massey about a young lady and if they did not have a quarrel about her. Without any comment by us as to the purpose of this evidence, it is plain that the argument of the State's attorney was within the limits of the testimony.

It is also urged that counsel for the prosecution referred to Massey's gun, in violation of an understanding that the weapon was not to be discussed. Whatever may have been agreed upon, the alleged violation is not sufficient error to reverse the conviction.

The first instruction for the People set forth at length the first count of the indictment. The second instruction contained a verbatim copy of the second count. There was no occasion for making the instructions so long and cumbersome, but, considering the record in this case, the prolixity is not prejudicial although it is justly criticised.

It is urged that the court refused to give several instructions tendered by defendant relating to the defense of alibi and to the definition of the term "reasonable doubt." The given instructions cover the law relating to those questions. Moreover, the abstract does not show the instructions given for the People and plaintiff in error were all the instructions given on the trial. In that state of the

record the refusal of certain instructions will not be considered. *People* v. *Dorr,* 346 Ill. 295; *People* v. *Ball,* 333 id. 104.

The attorneys for defendant, in support of the motion for a new trial, filed their affidavit setting forth that during a noon recess of the trial they saw one of the jurors alone in the toilet room of the Dunlap Hotel for more than five minutes with no bailiff or any of the other jurors present; that he was at a distance of seventy-five feet from the bailiff and other jurors; that during such time he had opportunity to talk with people and did undertake to engage one of defendant's attorneys in conversation concerning a relative of said juror mentioned by the attorney while examining the juror on his *voir dire.* No facts were stated which would show that the juror had any opportunity to communicate with any person other than one of defendant's counsel, and the affidavit affirmatively discloses that no prejudice resulted. In order to constitute grounds for setting aside the verdict of a jury on account of their conduct or because of any unauthorized communication with them it is necessary to show the defendant was prejudiced. *People* v. *Fisher,* 340 Ill. 216; *People* v. *Brothers,* 347 id. 530.

Defendant filed an affidavit stating that during the trial he observed a person whom he understood to be a newspaper reporter enter the jury's quarters at the court house while the trial was in recess and while the jurors were in their quarters, separated from the rest of the court and its officers. This affidavit makes no charge that the person entering the jury's quarters did or could communicate with the jury in any way.

A careful consideration of the whole record convinces us that defendant had a fair and impartial trial and that no reversible error intervened. The judgment of the circuit court is therefore affirmed. *Judgment affirmed.*