Glen DRUMMER, Appellant
(Defendant below),
v.
STATE of Wyoming, Appellee
(Plaintiff below).

No. 3026.

Supreme Court of Wyoming.

Nov. 1, 1961.

Raymond B. Whitaker, Casper, for appellant.

Norman B. Gray, Atty. Gen., W. M. Haight, Deputy Atty. Gen., and Harry E. Leimback, County and Pros. Atty. of Natrona County, Casper, for appellee.

Before BLUME, C. J., and PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Defendant, Glen Drummer, was charged with the first-degree murder of Ida Mae Rinehart. He was convicted by a jury of murder in the second degree, sentenced to serve not less than twenty-five nor more than thirty-five years' imprisonment in the penitentiary, and has appealed.

Deceased and defendant, though unmarried, had been living together for some time at 345 North Elk Street, Casper. In the same house resided another unmarried couple, Nolan Yates and Madeline White, and a single man, Mausolin Tulloch. Deceased was a waitress and prostitute, and defendant was unemployed although he had some interest in what he called a club. Both were apparently in good health, but he had lost a thumb and finger on his left hand and suffered some disability of that arm. He was 5' 6½" and weighed about 160 pounds; she was 5' 3" and weighed about 120.

On the early morning of Sunday, November 1, 1959, the defendant and deceased had talked over the telephone and at certain cafes, most of the conversations concerning his whereabouts the previous night. Deceased had been working the night before and both had been drinking. After their return to 345 North Elk Street, they continued to quarrel, and there was a physical encounter during which deceased was shot with a .22 caliber Ruger pistol. Defendant was the only living eyewitness, but Madeline White heard a number of occurrences and testified at the trial regarding them. Yates said he was awakened from sleep by Madeline's announcement that defendant had told her of deceased's death; he examined deceased to see if she were

dead; and, when he found she was, instructed Madeline to call the police. Defendant requested Madeline and Yates to tell the officers that the deceased had committed suicide. Soon after eleven o'clock two patrolmen in response to the call went to the house; shortly thereafter other police officers and the chief of police arrived; all of them were admitted by the defendant or other occupants of the premises. Certain photographs were taken, the coroner arrived, made examination, and took the body to the mortuary, where, some time later, a physician performed an autopsy. One of the officers took defendant, Yates, and Madeline to the police station. While in custody, the defendant, about five o'clock that evening, gave the chief of police a statement as to what happened at the death scene, and the next day gave a second and inconsistent statement.

It is contended by the defendant that the verdict of the jury was contrary to the law and the evidence and that the court should have sustained his motions for directed verdict made both at the close of the State's case and after all of the evidence had been presented. The evidence included the accounts of the investigating officers, the coroner, and the doctor who performed the autopsy, photographs, an expert witness' analysis of certain exhibits, defendant's version of the occurrences, his previous statements on the subject, and the testimony of the other occupants of the premises at 345 North Elk Street. There was no question as to the cause of death, the doctor performing the autopsy stating that the death was the result of a gunshot wound in the aorta. At the trial, the defendant took the stand in his own behalf, told at length of previous bickerings between himself and deceased, of some threats by her, and of some actual encounters. He related how on the early morning of November 1 they had talked on the telephone, later met at cafes and bars where she had questioned him as to his whereabouts during the previous night. He said that following their return to their quarters he was in the

kitchen and became aware of her in the bedroom brandishing a gun; after some exchange of words he threw a creme de menthe bottle, striking the gun and her face, breaking the bottle on the gun; he then got hold of the weapon; they struggled and fell; the gun went off; they went through the kitchen; he saw that the bathroom door was open, gave her a push, and ran into the bathroom. He then continued:

> "[I] just got in and reached to get this door and shut it, she got her head in. * * * I had the door catch her right down through her here, and had her braced with the door handle in here mashing her, and I said, I'll kill you, bitch, stop. She said, I will stop when you stop mashing me. So when I released the door she come right in and started to, she wheeled and shoved here, and she fell in the bathroom, and I went to unload the gun again, and it went off. I said, oh, god, have I shot this girl."

When he was asked where deceased was at the time of the second shot, he said, "I know she was in the bathtub, I was in the bathroom too, I don't know how far I was from her." He told of shaking the deceased, calling her name, and then of going to Nolan Yates' door and saying, "Nolan, Nolan, come hurry, I think I done shot Ida," how he said that he didn't intend to kill her, had considered and discussed leaving town, had asked Yates and Madeline to say that she had killed herself, and then, he, defendant, laid the gun across her chest.

■ The statements of the affray given by defendant to the officers were presented in evidence over the objection of defendant who does not now urge any error of the court in admitting the statements except to say that defendant at the taking of the November 1 statement was incapable of giving his consent because he was in a state of intoxication. It is undisputed that the first statement was taken some four hours following the administering of an Alcometer test. The officer who gave the test said that defendant appeared to have been drinking but not to excess and that defendant seemed to answer all his questions. No testimony was presented at the trial to show that when the statement was taken four hours later the defendant was intoxicated. As was said in Day v. State, 207 Ind. 273, 192 N.E. 433, 434, in discussing a conviction of assault and battery with intent to rob, "This court will not search the record for errors to reverse the cause. * * * It is the duty of appellant to make an affirmative showing of prejudicial error." We must therefore consider that the statements were properly admitted.

■ In the first one his account of the altercation was:

> "* * * Ida got my pistol and I fought with her and took the gun away from her. I put the gun back in the desk. I then hit her. Ida threw a bottle at me and I caught it and I took it and hit her in the head with it. I cut her head open and the blood was running. I told her lets stop fighting. We both then sat down on the side of the bed and talked a little. I then went in the living room and put some records on to play. I then heard a shot. I ran back through the kitchen to the bed room. Ida was not in the bed room and I said Ida where are you. I went to the bath room opened the door and Ida said I am all right. I said Ida are you shooting in here, have you got that gun. She said some thing but I can't remember so I pulled the door on shut and went back in to where I was starting to play records. I looked at a couple records and then I heard another bang so I ran back again to the bath room and there she was laying in the bath tub. * * *"

In his second statement he said:

> "* * * I turned and went back into the kitchen and then turned around and went back to the bed room Ida Mae was still arguing. As I walked into the room I saw that Ida Mae had my pistol so I grabbed up a bottle and throwed it and hit Ida Mae in the fore head with

it. At the same time I grabbed for the gun. We tusseled for the gun and I got it out of her hand and I pushed her back. I then went to open the gun to see if any thing was in it and it slipped and the gun went off. Ida Mae came right back at me so we tusseled out of the bed room into the kitchen. Then we went on into the bath room I pushed her away from me. I then opened the gun again and it slipped again and went off. Ida Mae Rinehart fell into the bath tub. * * *"

The only person who purported to have heard the altercation was Madeline White, who after telling of defendant and deceased arguing in the kitchen, said:

"* * * I heard Drummer say, 'You know where you left me last night, at home here in bed.' And she said, 'you're lying.' And he said, 'Are you calling me a liar, bitch?' And I heard him strike her. * * * because I heard her say, 'Don't hit me again, Glen.' * * * [Prior to that I had] heard a loud pow * * *. It was just a loud noise, sounded like somebody striking, hitting with something. * * Then I heard him say, 'Don't you know I'll hit you on your head, you don't think so?' and I heard the sound of breaking glass. * * * I heard him tell her to get up, then I heard a loud pow and pretty soon I heard him call her name twice. * * * Just shortly after that he came to our room and knocked on the door. * * * He said, 'Nolan, I think I have killed Ida.' "

Both Madeline and Yates said that defendant had asked them to tell the officers that deceased had committed suicide.

Other evidence adduced at the trial without objection from the defendant should probably be mentioned as it was inconsistent with defendant's testimony.

One of the officers testified that on the day of the arrest he found the creme de menthe bottle "broken in a million pieces behind the headboard of the bed." According to defendant's testimony, deceased at the time he threw the bottle was at the dresser which was at the foot of the bed.

The Federal Bureau of Investigation agent who made examination of certain of the evidence testified as to extensive deposits of gunpowder on deceased's dress, indicating that the gun was discharged nearby, and stated that, basing his opinion upon the photograph of the tub taken the day of the death, the gun was held below and inside the bathtub at the time it was fired.

As has been indicated, the testimony was not without conflict, but the jury was the sole judge of the credibility of the witnesses. Considering all aspects of the evidence, including the inconsistencies of defendant's versions, together with other testimony, and with uncontroverted facts, there was presented to the jury sufficient evidence to show that a homicide had been committed by defendant and that it was done purposely and with malice. Accordingly, the trial court was correct in overruling defendant's motions for directed verdict, and the present charge that the verdict is contrary to the evidence and the law is without merit.

■ It is argued that some eight instructions were improperly given. However, the only objection interposed at the trial was "defendant objects to Instructions 1 through 35 on the ground and for the reason that each and all the instructions do not embody the case nor the law of the State of Wyoming." In Richey v. State, 28 Wyo. 117, 201 P. 154, 159, 205 P. 304, a larceny case wherein the defendant had made a blanket objection to all instructions but on appeal attacked only certain of them, the court said:

"* * * The only exception * * was 'to the giving of all instructions by the court on behalf of the prosecution on the ground that they do not give the law applicable to the case.' * * * An aggrieved party must point out defi-

nitely and particularly the ruling of which he complains * * *."

We think the principle is equally applicable here. In State v. Chambers, 70 Wyo. 283, 249 P.2d 158, 162, we said:

"* * * counsel failed to point out in what particulars the instruction was erroneous. A trial court has a difficult time in settling upon just what instructions should be given after both sides have rested their case and, in all fairness to the trial judge, counsel should point out with definiteness and particularity wherein the instruction is in error. * * *"

See Rules 1 and 51, Wyoming Rules of Civil Procedure, and State v. Baber, Mo., 297 S.W.2d 439.

■ Defendant requested the giving of Instruction C which read:

"The defendant had a right, at the time of firing the fatal shot, to consider fully all acts of violence that he had seen the deceased commit, all threats that he had heard the deceased make, together with the disposition of the deceased, as the defendant knew it, in order that the defendant might know or believe what the deceased meant or intended at the time that the fatal shot was fired."

The court refused this instruction but gave Instruction 19 which read:

"The Court instructs the Jury that, if you believe from the evidence in this case that the deceased had previously made threats to the life of the defendant or to do him serious bodily harm, and that said threats and threatening violent acts had been communicated to defendant, and if you further believe that at time of the homicide, or just immediately prior thereto, the deceased had in her possession a gun, and at the time of the homicide did some act which reasonably appeared to the defendant to manifest her intention then and there to execute the threats previously made or made at that time, viewing the same from the defendant's standpoint, and if you further find that in repelling such intended or threatened assault, the defendant acted in necessary self-defense as elsewhere explained in these instructions, then you should not convict the defendant."

While such instruction was not identical with the one requested by defendant, we think it sufficiently informed the jury of defendant's rights on the points concerning which the request was made.

Accordingly, the rulings of the court regarding the instructions constituted no error of which defendant can now properly complain.

■ It is contended that the court permitted a violation of the privacy of the jurors in permitting other persons to be in the room when they looked at the exhibits. The situation about which defendant complains had its inception at the conclusion of the trial when the court stated:

"Ladies and gentlemen of the Jury, I presume the first thing you will probably do is to go to eat. I will have to warn you again not to discuss this case among yourselves until you go to the jury room, and not to form an opinion until after you have gone to the jury room and read the instructions and so forth.

"I wish the audience would keep their seats until the jury gets out.

"If they want to examine the evidence, they can with nobody present but themselves and the bailiffs. Is that agreeable?"

The prosecuting attorney responded, "It is with the State," and the defense counsel said, "Yes," whereupon the court said, "And nobody else present in the courtroom of course."

The occurrences in the courtroom following the trial and before the jury was given the case for deliberation were presented to the trial court by affidavits at the time of the motion for new trial. The statements of the bailiffs and of the court reporter indicated that following the lunch period on the final day of the trial the court

reporter requested some occupants of the courtroom to leave, brought in the exhibits from the vault and placed them on the reporter's table a short distance from the jury box, the jurors entered, and there examined the evidence for approximately thirty minutes. During that time one of the bailiffs sat in the jury box some eight feet away. The other bailiff and the court reporter were behind the rail in the audience section of the courtroom. All three said they heard the voices of the jurors but did not distinguish what was being said. They also stated that no one came into the room or interfered with the jury. Other affiants stated that they had peeked through the doors and had seen the jury looking at the exhibits, talking among themselves, some of them holding slides up toward the light and projecting the slides on the wall, and one of the jurors pointing a gun at another who appeared to be retreating. A news reporter had entered an anteroom at the rear of the court some distance from the portion occupied by the jury and for sixty or ninety seconds had observed the jury, heard them talking, but could not distinguish what they were saying.

There was nothing to show that during the time the jury was in the courtroom looking at the exhibits the members engaged in any deliberations, and it cannot be presumed that the jury violated the instructions of the court not to discuss the case until they retired to the jury room after they had been instructed, nor was there any evidence of interference by persons not on the jury. The court reporter and bailiffs remained some distance from the part of the room occupied by the jury and did not interfere in any way. The members of the jury were not even aware that they were being observed by anyone else. It is unnecessary to discuss the cases cited by defendant to support the charge of error on this point since they all related to interference with deliberations. The charge of error in this regard although unjustified on the facts illustrates the desirability of conducting all examination of real evidence before the court and in the presence of defendant, not because the examination by the jury under other circumstances is inherently improper but rather to avoid unwarranted suspicion.

■ It is charged that the jury conducted improper experiments during the examination and that the request to the defendant in the presence of the jury for the examination was improper so that the consent thereto was ineffectual. As previously noted, defendant's counsel readily assented to the court's suggestion, and it would seem to have been routine for counsel to have then requested that such examination be conducted in the presence of the court if that had been defendant's desire. As to the activities of the jurors during the period of examination, we think the principle announced in Espy v. State, 54 Wyo. 291, 92 P.2d 549, 557, is applicable. The court there stated that a defendant having given permission for exhibits to be taken to the jury room cannot complain because a jury examines exhibits or even makes experiments therewith.

■ It is also contended that the jury was improperly separated and that without the knowledge of the bailiffs there was opportunity for other persons to communicate with them. The evidence adduced at the motion for new trial by affidavits indicated that the jury was kept separate from other persons, that so far as was known by the bailiffs there was no communication of the jurors whatever with other persons, and that they were not allowed to listen to radio, view television, or read newspapers. However, it was necessary that the jury go through certain portions of the hotel to reach the dining area and their private rooms; especially on the evening of March 17 when a St. Patrick's day celebration was in progress, the members of the jury were in fairly close contact with other persons for a short time. It also appears that certain members of the jury received clothing and personal articles but that no communications were therein contained. Although many counties in the State have provided private living quarters for juries during the periods when the members are held togeth-

er, and such practice is most desirable, it is not essential, and this court cannot presume that the necessity of quartering juries in public hostelries constitutes error per se.

■ There was no showing of prejudice to the defendant on account of any of these claimed improprieties of the jury. As was said in Trombley v. State, 167 Ind. 231, 78 N.E. 976, 977, and approved in Myers v. State, Ind., 168 N.E.2d 220, 223:

> "We are justified in disturbing a verdict of guilty on account of the alleged misconduct of a juror only when it is shown that such misconduct was prejudicial to the rights of the defendant, or when such a state of facts is shown that it may fairly be presumed therefrom that the defendant's rights were prejudiced. * * *"

And see People v. Coniglio, 353 Ill. 643, 187 N.E. 799, 804; Udouj v. State, 182 Ark. 1186, 30 S.W.2d 822, 823.

■ Defendant charges the occurrence of a number of other errors but fails to cite any authorities to support his position. It has often been stated that the court is not required to search out authorities but may presume that counsel has found no case after diligent search. Shobe v. Tobin Construction Co., 179 Kan. 43, 292 P.2d 729, 733. It was stated in People v. Gidney, 10 Cal.2d 138, 73 P.2d 1186, 1189, that "In the absence of citation of authority, claim of alleged error will not be considered." See State v. Mundell, 66 Idaho 339, 158 P.2d 799, 801; State v. Streit, 248 Iowa 260, 80 N.W.2d 318, 319.

The record discloses no prejudicial error occurring in the trial of defendant, and there was presented to the jury substantial evidence from which the jury could properly have found defendant guilty of killing deceased, Ida Mae Rinehart, purposely and with malice.

Affirmed.