Harry L. LONQUEST, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4035.

Supreme Court of Wyoming.

March 23, 1972.

Rehearing Denied May 9, 1972.

Raymond B. Hunkins, of Jones, Jones, Vines & Hunkins, Wheatland, for appellant.

Clarence A. Brimmer, Atty. Gen., and Richard A. Stacy, Asst. Atty. Gen., Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN and GUTHRIE, JJ.

Mr. Justice GUTHRIE delivered the opinion of the court.

This appeal is taken from a conviction for first degree murder arising from the shooting of appellant's wife in Platte County on July 10, 1970. The case was tried on a change of venue to Laramie County and a verdict of first degree murder without capital punishment was returned on May 3, 1971. Appellant relies

upon four grounds for reversal, stated briefly as follows:

1. Error in receiving in evidence a shotgun and other articles along with pictures thereof taken by the sheriff from the ranch house of deceased and appellant.

2. Error in receiving an alleged confession of appellant.

3. Reception of prejudicial and irrelevant evidence as to prior conduct of appellant.

4. Error in giving of certain instructions and failure to give a certain proffered instruction.

The record is voluminous so no attempt will be made to make a full statement of the facts preliminarily. The facts applicable to and necessary for an understanding of these contentions and for our disposal thereof will be set out in discussing the separate contentions. To present the facts in chronological order, the question of the search and seizure will be first discussed. For convenience appellant will be referred to hereafter as defendant.

## CLAIMED ILLEGAL SEARCH AND SEIZURE

At or near the hour of noon on July 10, 1970, Pauline Van Dyke received a telephone call at the LaRamie Hotel in Wheatland from defendant. He said, "I think Thelma is dead * * * I think I shot her." The sheriff was advised of this call and after getting investigative equipment went to the hotel to verify the call and find out from whom it had come. He then proceeded to the Lonquest Ranch some 15 miles northeast of Wheatland. Upon his arrival he entered the back porch and knocked upon the inner door. He called, "Harry" but received no response. He heard certain moaning or mumbling. When he received no answer he entered the kitchen and saw the body of the deceased, whom he believed to be dead. The defendant was slumped against the door sill leading to the living room. After the sheriff's entry defendant said, "I told

her I would shoot her, she wouldn't listen to me so I shot her." Defendant asked for help and the sheriff helped him in to the bedroom. There was a discharged shell lying on the kitchen table in plain sight. Upon his return to the kitchen he again saw the shotgun shell which was lying on the table in the middle of the kitchen. He observed from the kitchen the opened box of shotgun shells in an open cupboard in the bathroom, the bathroom door being open. There were some bloody clothes outside the bathtub in a pail and others in the bathtub. After defendant was taken to the hospital the sheriff examined the premises further and found a shotgun in the bedroom behind the door which was not in view when he took the defendant into the room because the door was propped open. The sheriff took pictures of these various exhibits and of the scene which were offered and received in evidence.

Defendant filed a motion to suppress this evidence which was heard on January 26, 1971. After hearing the testimony of the sheriff the motion was denied. Immediately prior to the taking of evidence, after objection to the mention of these seized items and pictures in any opening statement, the trial judge heard evidence concerning the seizure to a fuller extent and refused to suppress or withhold such evidence from the jury. The factual situation herein will be drawn from both hearings.

The sheriff went to the ranch to investigate this occurrence because of the telephone call of Pauline Van Dyke. He had no knowledge of the condition of the defendant or what had transpired. Because he did not know the situation at the ranch he had called to have the coroner come out and had also called for an ambulance. When he saw Mrs. Lonquest's body he could tell she was dead and the cause was a wound hole in the back; he was sure it was caused by a shotgun. He did not arrest the defendant. He had no idea whether this death had occurred because of a fight or was accidental. When he departed the sheriff took with him the shell, the box of shells, the shotgun, and the pictures which he had

taken at the scene prior to the time defendant was taken to the hospital. The record indicates the discharged shell and box of shells and at least a part of the clothes were in plain sight of the investigating officer. His right to be present on the premises could not be seriously questioned, being as it was in response to a call by defendant. No search was involved in the discovery of these items and they could be seized by the officer. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067; Alcala v. State, Wyo., 487 P.2d 448, 453, certiorari denied 405 U.S. ——, 92 S.Ct. 1259, 31 L.Ed.2d 466.

■ This leaves the question of the shotgun found behind the open door to the bedroom and not in plain view until the door swung out. Defendant places his reliance on the case of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, rehearing denied 396 U.S. 869, 90 S. Ct. 36, 24 L.Ed.2d 124. The factual situation encountered therein and upon which that decision is based makes that case inapplicable to this matter. Chimel does recognize a reasonable search depends upon a totality of the facts and does not deny the right to make "reasonable" searches. It will be necessary to examine this matter upon its factual background.

The case of State v. Chapman, Me., 250 A.2d 203, is particularly applicable because of similarities in the factual situation. The officer in that case was answering a call to the home of defendant. He saw deceased in a chair. Defendant volunteered that deceased had fallen and hemorrhaged. A second officer arrived, looked around, and took some pictures. Defendant was then taken into custody and to the sheriff's office. No charges were filed at that time. After some cursory checking the house was left in charge of another officer. Upon their return the next day they made a complete and thorough search of the entire house and basement. One officer went into and searched three trash barrels in the garage, in one of which concealed under paper and trash he found a whiskey bottle upon which was coagulated blood and hair and which was alleged to have been the murder weapon. Prior to its removal a picture was taken thereof. Objections were made and it was sought to suppress the picture and bottle. The court in that case upheld the search and seizure, noting the right of the officer to be on the premises where a homicide had occurred. The case suggests the importance of the search being "part of a continuing series of events which included the original arrest and continued uninterruptedly as lawful police investigation and action," 250 A. 2d at 208. On the same page in Chapman an excerpt from the case of Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, which epitomizes a philosophy applicable herein and of which we must not lose sight, is cited with approval as follows:

> "The exclusionary rule (excluding from evidence the fruits of unlawful searches and seizures) has its limitations, however, as a tool of judicial control. It cannot properly be invoked *to exclude the products of legitimate police investigative techniques* on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections. * * *"

To ignore this would be to hamper and prevent proper investigation in this most serious of crimes with a detrimental effect to society as a whole and to the persons involved. The opinion mentions the two controlling facts for disposal of that matter to be the original lawful entry and that the police had never abandoned their possession or control of the premises. In upholding this search the court further cites the case of Stevens v. State, Alaska, 443 P.2d 600, certiorari denied 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586, particularly with reference to the right to "process the scene." The following is then cited from the Stevens case with approval, 250 A.2d at 207:

> "* * * and upon learning that a homicide had been committed, it became Chief Knudson's *duty to conduct an investigation into the circumstances. This*

duty carried with it the right to inspect the premises. * * *"

The case of State v. Oakes, Vt., 276 A. 2d 18, certiorari denied 404 U.S. 965, 92 S.Ct 340, 30 L.Ed.2d 285, is very similar and was decided subsequent to Chimel. That court finds no difficulty distinguishing the cases. In that case there was a telephone call from defendant asking for help and reciting, "She's here on the floor, dying." 276 A.2d at 21. Accused told the officers he had shot the woman. One of the officers went into an adjoining room where he saw an ironing board set up and upon which there was a 22–410 over-and-under rifle. The officers took this rifle along with some other articles with them when they removed defendant. Defendant moved to suppress and objected to the admission at the trial. The original entry was conceded to be lawful. The court said, 276 A.2d at 24:

"* * * The officers were confronted with the body of Mrs. Oakes and circumstances making it their duty to conduct an investigation on the premises. This, of itself, justified the search and the taking into possession of the related instrumentalities there present. · * * *"

Later in the opinion, 276 A.2d at 25, the court further observed:

"It has already been noted that this investigation was taking place at the scene of the homicide. The role of the police officer carries with it the duty and responsibility to carry out such an investigation upon the discovery of what appears to be a crime. Once authorizedly on the scene, enforcement officers are under a duty to complete their investigation of the occurrence. Here, even if their original entry had been obstructed rather than solicited, the emergency situation called to their attention would have justified a warrantless entry and investigation of the scene as a part of their authorized duty. [Citing cases.]"

The Stevens case, supra, reiterates and discusses at some length not only the right but the duty of the officer to make such search and seizure in connection with an investigation of a homicide. We find in Patrick v. State, Del., 227 A.2d 486, 489, as clear a statement of the rule governing such situations as we have encountered:

"The general rules governing searches and seizures are subject to the exception of emergency situations, sometimes called the 'exigency rule.' The reasonableness of an entry by the police upon private property is measured by the circumstances then existing. The right of police to enter and investigate in an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers, and derives from the common law. [Citing case.] The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification for what otherwise may be an illegal entry. * * *"

In addition thereto, inasmuch as the defendant based his defense on the plea of insanity and accidental shooting, the reception of this evidence if error was harmless as was expressed in the Oakes case, 276 A.2d at 25–26:

"Moreover, having in mind that the defense in this case was predicated, alternatively, on accident or mental irresponsibility, the matters evidencing the shooting and identifying the gun were issues not in controversy. The shooting episode was not denied. Therefore, even if some error can be discovered in connection with evidence offered in proof of these issues, it would be harmless beyond a reasonable doubt. [Citing case.]"

For these reasons the seizure of the shotgun herein was proper and the refusal of the court to suppress its admission as an exhibit was not error.

## THE CONFESSION

The trial court, after a lengthy evidentiary hearing, admitted the statement or confession taken by Don Sherard, the county attorney, in the presence of Frank

Jones, his deputy, and Betty Morris, a nurse's aid. The court found as a matter of law that the defendant gave this confession "voluntarily with full understanding of his rights, comprehension of the consequences of giving his statement," and that "Defendant did intelligently, and understandingly waive his right to have counsel present at the taking of the statement."

Defendant was brought to the Platte County Hospital at approximately 1:30 p. m. At the request of the coroner, Dr. Allison drew blood for a blood test, to which procedure defendant agreed. An analysis of this blood showed an extremely high blood alcohol content of 374.3 m.g. percent. At approximately 3 p.m. Sherard, in company with his deputy Jones, entered the room of defendant and secured the presence of Betty Morris. Sherard advised defendant of his rights as set out in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, which the sheriff had also done at the ranch before defendant came to the hospital. These lay witnesses, Sherard and Morris, note that defendant gave lucid and responsive replies to questions, that he had no hallucinations or delusions, that he recognized people, and that he corrected and in some cases argued with Sherard about correct statements, particularly when he suggested to defendant that this killing had occurred on the spur of the moment and not as the result of a plan to kill deceased. The statement was read to him and he signed it.

There is a sharp conflict of testimony as presented by the experts, not an uncommon thing, as to the competence and understanding of defendant at the time the statement was given. Dr. Moore, a witness for the State, expressed the opinion that defendant knew and understood what he was doing at that time. There is the further testimony of the witnesses Morris and Sherard, as above mentioned. There is also other testimony in the record indicating responsiveness and understanding by the defendant of inquiries made to him. The court resolved this conflict in favor of the State, applying the standard of proof beyond a reasonable doubt.

Defendant contends it was error to receive this confession because of the constitutional guarantees of the Constitution of the United States and of the State of Wyoming, contending that he was incapable of knowingly, intelligently, and voluntarily waiving his rights; that having requested an attorney, no questioning could be engaged until that attorney was in attendance; and that his will was overborne and the statement was not a product of his rational intellect.

It is not improper to note that defendant volunteered to the sheriff when he came to the ranch that he had shot his wife—that he told her he would and he did—and that he kept repeating over and over to Morris and even repeated when not directed to anyone that he had killed his wife. This may have been the result of compulsions but ones that originated within this defendant and not from any outside source. It may also be considered of some significance in determining the condition of the defendant as to his understanding that the confession closely followed and coincided with the other statements and physical facts as they appeared.

The recent case of Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, is of help in a consideration of this matter, particularly insofar as defendant asserts a violation of his federal constitutional rights. That case held it was the duty of the trial judge to determine the admissibility of the confession and that it was not constitutionally impermissible to use the standard of preponderance of the evidence to determine the same even though the question of voluntariness was not thereafter to be submitted to the jury. This latter of course was done in the case at hand by instruction, giving to the jury the standard of proof beyond a reasonable doubt and instructing them to reject it unless they found the same voluntary. Thus in this case we have two separate finders of fact considering the question of the voluntari-

ness of this confession under the highest standard of required proof.

The discussion in Lego further emphasizes that the voluntariness hearing is not to enhance or determine reliability of the confession but only to determine if it had been given voluntarily. In presenting the matter of the admissibility of this confession defendant refers to the testimony of Dr. Montague, who treated defendant several weeks before the fatal incident. He cast doubt upon the reliability of the confession and the competency of defendant at that time. This evidence was not presented at the hearing on admissibility so that it was not properly considered in the disposal of this specific question. It was directed to the jury and undoubtedly considered by them under the instructions of the court both as to this confession and as to insanity.

The most troublesome aspect of this matter is a determination of the effect of the high alcoholic blood content and defendant's admitted acute alcoholism upon his grasp of reality so that the voluntariness may be determined. The record does reflect some testimony as to a static rate at which alcohol is eliminated from the system, the figure being given at 20 m.g.'s per hour. If this be correct the blood alcohol content was at least some 30 m.g.'s less at the time of taking the statement. The other experts note different rates of elimination, variant because of individual conditions. There is considerable testimony affecting tolerance or "adoption capability" in individuals of heavy drinking habits, indicating one man accustomed to consuming large quantities of alcohol may be much less affected in his normal functions as contrasted to one unaccustomed to the use of alcohol or even a moderate user. The experts, though admitting this in principle, could not give any definite answers as to the limits or proper application thereof. It is apparently still in the study stage. It is

a fact the degrees of intoxication and its effect on the competency or processes of an individual can only be determined from individual to individual and upon the surrounding facts.

It is difficult for a trial court to determine the competency and understanding of such a person but it can and did in this case rely upon the testimony and factual situation recited by the witnesses to defendant's actions, condition, and conduct. An appellate court relying solely on the cold and written word is faced with a difficult if not impossible determination if it is asked to review such finding. See Moss v. State, Wyo., 492 P.2d 1329, 1333.

These circumstances make particularly applicable the statement by the court in State v. Collins, 253 Or. 74, 453 P.2d 169, 170, where the defendant claimed that when he made certain statements he was drunk or "hung over" and did not understand or waive his rights, as follows:

"We have held that whether or not an accused understood the warnings is a matter of historical fact and if there is any evidence to support the trial court's finding that the accused did understand, the finding will stand. * * *"[1]

It is to be further noted that not one but two finders of fact, i. e., the trial judge at the evidentiary hearing out of the presence of the jury, and the jury under proper instructions after having heard the evidence, have both made factual determination as to the voluntariness of the confession. From all that appears the jury could have disregarded this confession and could still have arrived at the verdict. Courts may be too inclined to assume that jurors in their traditional role as factfinders ignore this duty enjoined by the instructions. This court has heretofore held that there is a presumption a jury follows the instructions, Dobbins v. State, Wyo., 483 P.2d 255, 259.

There could be no serious question of the factual basis for the court's

1. See State v. Sanders, 101 Ariz. 410, 420 P.2d 281, 283–284; State v. Hansen, 199 Kan. 17, 427 P.2d 627, 630; and State v. Smith, 80 N.M. 126, 452 P.2d 195, 198.

finding or the determination by the jury of the voluntary character of the confession in the absence of the high blood alcohol content of the defendant. The question is whether the defendant's state of intoxication was such that he was unaware of his rights and unable to make an intelligent waiver. There is testimony by the State's experts as well as the lay witnesses upon this question. It would be an unworkable and unfair rule if an accused could in all cases as a matter of right insulate himself from the consequences of any statement voluntarily and understandingly made by the prior voluntary taking of an amount of alcohol. Necessarily this question must be determined on the facts of each case as they arise. No confession or statement should be received unless the maker was capable of realizing what he was saying and not suffering from delusions or hallucinations, so that he knowingly, understandingly and comprehendingly made the statement. The trial judge first and the jury are the only possible available instruments by which such determination can reasonably be made. Defendant does not contend that the general rule as to the reception of confessions from intoxicated persons is other than as set out in People v. Schompert, 19 N.Y.2d 300, 279 N.Y.S.2d 515, 519, 226 N.E.2d 305, 308:

> "The general rule applicable to confessions obtained from persons under intoxication has been well stated to the effect that 'proof that the accused was intoxicated at the time he confessed his guilt of crime will not, without more, bar the reception of the confession in evidence. But if it is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements, then the confession is inadmissible.' * * * " [2]

Defendant's contention being based upon the facts in this case and apparently under the "mania" exception noted in People v. Schompert, supra, and other cited cases, it is interesting to note the discussion defining "mania" in People v. Schompert, 19 N.Y.2d 300, 279 N.Y.S.2d at 518, 226 N.E. 2d at 308, as follows:

> "Lack of awareness or understanding alone might be sufficient to exclude a confession in the rare case where it clearly appears that at the time of the confession the confessant was so intoxicated as to lack mental capacity, that is, he was unable to appreciate the nature and consequences of his statements. This, no doubt, is the 'mania' referred to in the older cases."

This court in Kennedy v. State, Wyo., 422 P.2d 88, 90–91, recognized this was a factual determination to be made from the evidence.

■ It is our opinion there was sufficient evidence upon which the trial judge could base his finding that the confession was knowingly and voluntarily made. Defendant has made a great part of his argument based on the case of Miranda v. State of Arizona, supra. Notably the warnings given defendant are the Miranda warnings. The Miranda case only sets out certain elements necessarily satisfied in determining the admissibility of a confession. Particularly when taken in connection with the Lego case it cannot be said to have set out the necessary quantum of proof.

■ Defendant further strongly contends that because he asked for or advised the coroner he wanted his attorney, Bill Jones, while on the way to the hospital that all further interrogation should have ceased until his attorney was present. The record is confusing as to whether the

---

2. See People v. Byrd, 42 Cal.2d 200, 266 P.2d 505, 511, certiorari denied 348 U.S. 848, 75 S.Ct. 73, 99 L.Ed. 668; Mergner v. United States, 79 U.S.App.D.C. 373, 147 F.2d 572, certiorari denied 325 U.S. 850, 65 S.Ct. 1085, 89 L.Ed. 1971; 3 Wigmore on Evidence, § 841, p. 489, et seq. (Chadbourn Rev.1970); 2 Wharton's Criminal Evidence, § 388, p. 122 (12th Ed.). Other cases have held without further comment that intoxication merely goes to the weight, State v. Isom, 243 N.C. 164, 90 S.E.2d 237, 238, 69 A.L.R. 2d 358, and cases collected in Annotation 69 A.L.R.2d 361, 364, § 3, et seq.

county attorney knew and heard of this request prior to the time he took this statement. However, the record shows without dispute that prior to taking the statement defendant was advised of his right to counsel and specifically waived it. As a matter of fact, defendant advised the county attorney he wanted to make a statement. The right to counsel is inalienable but this right cannot rise to the dignity that it cannot be waived.[3] Defendant also suggests the inadmissibility of the confession under this state of facts by virtue of Canon 9, American Bar Association Canons of Professional Ethics. We find this worthy of no discussion except by reference to State v. Nicholson, 77 Wash.2d 415, 463 P.2d 633, 636–637.

## PREJUDICIAL EVIDENCE OF PRIOR CONDUCT

The State called a series of four witnesses who testified as to various instances of personal violence toward the deceased and threats made by the defendant to kill her. The trial court limited evidence of this character to events which occurred in 1965 or thereafter and excluded earlier evidence on the ground of remoteness. Defendant contends that these incidents tended to put his character in issue and were too remote in time.

The admissibility of this type of evidence in a case of this character has been recognized in Alcala v. State, Wyo., 487 P.2d 448, 455, certiorari denied 405 U.S. ——, 92 S.Ct. 1259, 31 L.Ed.2d 466. The basis of the admission of such evidence is that it is relevant to show motive and malice. This court has heretofore announced its adherence to the prevalent rule that the question of remoteness is directed to the trial court's discretion and that ordinarily remoteness affects the weight of the evidence rather than the admissibility. The discussion of Chief Justice Blume in State

v. Koch, 64 Wyo. 175, 189 P.2d 162, 164, sets out this view. The case of State v. Grider, 74 Wyo. 88, 284 P.2d 400, 406, rehearing denied 74 Wyo. 111, 288 P.2d 766, repeats recognition of the principle that the question of remoteness rests in the discretion of the trial court.

## INSTRUCTIONS

Defendant asserts error resultant from giving Instructions 4, 6, and 7, which define and discuss reasonable doubt. The objections asserted thereto were that they attempted to define "reasonable doubt" and this is "contrary to law," and as further grounds asserted that the giving of separate instructions raised a special emphasis thereon and that the instructions defined what reasonable doubt is not rather than what it is. We are confined in our consideration of this assignment of error to the express grounds stated unless there is fundamental error. The test of an objection which raises a question for consideration is set out in Alcala v. State, supra; Drummer v. State, Wyo., 366 P.2d 20, 23–24, and State v. Chambers, 70 Wyo. 283, 249 P.2d 158, 162. The first objection has been decided adversely to the defendant, having been held it was not error to so instruct, Alcala v. State, supra; Carrillo v. State, Wyo., 474 P.2d 123, certiorari denied 401 U.S. 921, 91 S.Ct. 907, 27 L.Ed.2d 823. It is true this court has held it is not error not to so instruct, State v. Goettina, 61 Wyo. 420, 158 P.2d 865, 882; State v. Velsir, 61 Wyo. 476, 159 P.2d 371, 378, 161 A.L.R. 220. This court in Alcala comments thereon, 487 P.2d at 460, and repeats the comments in more definite form in Lofton v. State, Wyo., 489 P.2d 1169, 1174. The other ground of claimed error that results from special emphasis and the negative statement of the term is not pursued in the brief or argument and no demonstrated prejudicial effect is attempted. It is difficult to conceive that these in-

---

3. Dillon v. United States, 10 Cir., 391 F. 2d 433, 437, certiorari denied 393 U.S. 889, 89 S.Ct. 208, 21 L.Ed.2d 168; State v. Adams, 76 Wash.2d 650, 458 P.2d 558, 572, reversed as to death sentence 403 U.S. 947, 91 S.Ct. 2273, 29 L.Ed. 2d 855; Reid v. State, Okl.Crim., 478 P. 2d 988, 999.

structions were prejudicial in light of the overwhelming proof of guilt adduced by the State.

■ Defendant further asserts the trial court erred in including in Instruction 16 a reference to "fits of passion," contending there was no evidence thereof, and purporting to instruct the jury concerning emotional insanity. This claim was based upon the assertion there is no evidence in the record that this crime could have been committed in a fit of passion. This simply is not consonant with the record. There is testimony of the earlier fits of anger, violence, threats to kill, and beatings directed against the deceased by the defendant during their married life. The reference to emotional insanity is a mere explanation of the term "fits of passion." All this portion of the instruction given to which objection was made comes directly from Flanders v. State, 24 Wyo. 81, 156 P. 39, 42, rehearing denied 24 Wyo. 81, 156 P. 1121.

■ Defendant further claims it was error to refuse an instruction which summarized involuntary hospitalization proceedings, § 7–242(b), W.S.1957, setting out what proceedings would be instituted for hospitalization if the defendant were acquitted on grounds of insanity. It would be improper to give such an instruction.

The function of the jury in this case or any criminal case is to determine the guilt or innocence of a defendant upon the evidence presented. This cannot depend upon probable or proper disposal of the defendant thereafter. Nicholson v. State, 18 Wyo. 298, 106 P. 929, 931; State v. Park, 159 Me. 328, 193 A.2d 1, 5. The giving of such instruction injects a totally irrelevant element into the jury's deliberations separate and apart from the function they serve and may tend to confuse them, Pope v. United States, 5 Cir., 298 F.2d 507, 508. The suggested instruction may be an invitation for the jury to reach a compromise verdict, People v. Adams, 26 N.Y.2d 129, 309 N.Y.S.2d 145, 257 N.E.2d 610, 614, certiorari denied 399 U.S. 931, 90 S.Ct. 2262, 26 L.Ed.2d 800. There are few jurisdictions which hold that such instruction should be given. [4]

It might be further suggested that the legislature by its enactment of § 7–242(b) delegated the duty of the determination of this question to a separate forum before a commission or jury who should determine this issue. Because of the legislature's action assigning this determination to another body at another time, it would be improper to inject this issue into the trial of the principal case.

Affirmed.

---

4. The Adams case above contains an excellent discussion of this division of authority showing a very small minority of states which hold the instruction proper.

State v. Hood, 123 Vt. 273, 187 A.2d 499, 500–501, 11 A.L.R.3d 732, and Annotation 11 A.L.R.3d 737, et seq., are also instructive.